RYEN GODWIN
SCHWABE, WILLIAMSON & WYATT, P.C.
1420 5th Avenue, Suite 3400
Seattle, WA 98101
(206) 622-1711
rgodwin@schwabe.com
*Attorney for Petitioners*
*Navajo Transitional Energy Company, LLC*
*National Mining Association*

LAWSON FITE*
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave, Suite 1900
Portland, OR 97204
(503) 222-9981
lfite@schwabe.com
*Attorney for Petitioners*
*Navajo Transitional Energy Company, LLC*
*National Mining Association*

KEN PEARSON*
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Ave, Suite 1900
Portland, OR 97204
(503) 222-9981
kpearson@schwabe.com
*Attorney for Petitioners*
*Navajo Transitional Energy Company, LLC*
*National Mining Association*

*\*Application for admission pro hac vice
forthcoming*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| NAVAJO TRANSITIONAL ENERGY COMPANY, L.L.C. and NATIONAL MINING ASSOCIATION,<br><br>    Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; SONYA GERMANN, in her official capacity as Montana-Dakotas State Director, Bureau of Land Management; and ANDREW ARCHULET in his official capacity as Wyoming State Director, Bureau of Land Management;<br><br>    Respondents. | Case No. _____ |

## PETITION FOR JUDICIAL REVIEW OF AGENCY ACTION

Pursuant to District of Wyoming Local Rule 83.6 and *Olenhouse v. Commmodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994), Petitioners Navajo Transitional Energy Company, LLC ("NTEC") and the National Mining Association ("NMA") respectfully petition the court for review of Respondent Bureau of Land Management's ("BLM") November 20, 2024 Records of Decision ("ROD") and May 17, 2024 Final Environmental Impact Statements ("FEISs") for the Miles City Field Office Resource Management Plan Amendment ("MCFO RMPA") and Buffalo Field Office Resource Management Plan Amendment ("BFO RMPA") banning all coal leasing and terminating pending coal lease-by-applications, within the Miles City Field Office Planning Area in the State of Montana and the Buffalo Field Office Planning Area in the State of Wyoming. The two planning areas consist of the largest energy producing onshore region of the country jointly known as the Powder River Basin ("PRB"). On November 20, 2024, defendant Stone-Manning signed both RODs and final RMPAs for the MCFO and BFO. These RODs ban new coal leasing across a total of 16.4 million acres of federal mineral estate, indefinitely withdrawing over 2 million acres from any possibility of future leasing.

Both RODs are final agency actions subject to this Court's review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* Petitioners seek judicial review under the APA for violations of the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*, the Mineral Leasing Act ("MLA") as amended by the Federal Coal Leasing Amendments Act of 1975 ("FCLAA"), 30 U.S.C. §§ 201 *et seq*, the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), as amended, 30 U.S.C. §§ 1201 *et seq*, the Jones Act of 1927, as amended 43 U.S.C. § 870, Omnibus Enabling Act of February 22, 1889,

50th Cong., 2d sess., ch. 180, 25 Stat. 676, and the Wyoming Admission Act, § 4, 51st Cong., 1st sess., ch. 664, 26 Stat. 222, 223 (July 10, 1890).

## I.    PARTIES

1.    Petitioner, Navajo Transitional Energy Company, LLC ("NTEC"), is a single member, limited liability company wholly owned by the Navajo Nation and incorporated under the laws of the Navajo Nation with its principal place of business in Shiprock, New Mexico wholly within the Navajo Nation. NTEC's chief executive and management staff work in Broomfield, Colorado. NTEC was formed to promote the economic and financial interests of the Navajo Nation and its citizens, while remaining dedicated to responsible management of the Nation's natural resources. As a Navajo Nation entity, it is cloaked with sovereign immunity. The filing of this action is not intended to act and does not act as a waiver of NTEC's or the Navajo Nation's sovereign immunity.

2.    The Navajo Nation is a federally recognized sovereign Indian tribe, with territories spanning areas of Arizona, Utah, and New Mexico. As one of the largest tribes in the United States, the Navajo Nation has a rich cultural history, underpinned by a deep connection of the Nation's members to their lands. Under the Navajo Treaty of 1868, the Navajo Nation lands are set apart as a permanent homeland for the Navajo people, for their exclusive use and occupation without interference, and the Nation reserved unto itself the right to manage its lands. Article XIII, Treaty of Bosque Redondo, 15 Stat. 667 (1868).

3.    Through its diversified energy portfolio, NTEC provides approximately 31 percent of the annual revenue to the Navajo Nation's General Fund. In addition, NTEC sponsors numerous programs throughout the Navajo Nation for the benefit of the Navajo people. Any decline in NTEC's revenue will have an immediate and irreparable effect on NTEC as well as the Navajo Nation's self-governance, sovereignty, and self-determination. NTEC's diversified energy

portfolio includes coal mines on the Navajo Nation (Navajo Mine), in Montana (Spring Creek Mine, Big Horn County), and in Wyoming (Antelope Mine, Campbell and Converse Counties; and Cordero Rojo, Campbell County) amongst other assets. Cordero Rojo Mine is located within the Buffalo Field Office Planning Area described in the BFO RMPA. Antelope Mine is located, in part, within the Buffalo Field Office Planning Area described in the BFO RMPA. The Spring Creek Mine is located wholly within the Miles City Field Office Planning Area described in the MCFO RMPA.

4.      Spring Creek Mine is located in Big Horn County, Montana and has 265 full-time employees. Since 2005, Spring Creek has contributed approximately $1.4 billion to the local economy, exclusive of taxes and royalties. In 2023, NTEC paid $63.6 million in taxes and royalties in 2023 associated with its ownership and operation of the Spring Creek mine with $47.8 million being allocated to the State of Montana. Most of the remainder is paid to Big Horn County which amounts to approximately $500,000 to $600,000 per month.

5.      Based upon the current mine plan, the life of mine at the Spring Creek Mine is a little over 10 more years, meaning absent the acquisition of additional federal coal, Spring Creek Mine will cease coal mining around 2034 with four to five years of reclamation following. Thereafter, the Spring Creek Mine will progress into full and final reclamation for approximately four to five years. In 2013, the Spring Creek Mine applied for a lease-by-application for federal coal managed by the BLM in the MCFO known as SCM LBA II. The SCM LBA II remains pending with only approximately two years of a ten-year leasing process remaining before lease issuance. The federal coal in this lease is necessary to keep the Spring Creek Mine operating past 2034; however, under the MCFO RMPA the BLM will cancel and return Spring Creek Mine's SCM LBA II application. If Spring Creek Mine is required to recommence the SCM LBA II there is not sufficient time under

the onerous leasing process to complete the SCM LBA II before the Spring Creek Mine will cease mining in 2034. A ban of coal leasing, including termination of SCM LBA II will isolate coal owned by the state of Montana so that it is not feasible to mine.

6.     The Antelope Mine is located in Campbell and Converse Counties, Wyoming and has approximately 265 full-time employees. Coal mining at Antelope Mine will end in 2042 based upon current leased and permitted coal reserves. Since 2014, NTEC and its predecessor in interest have pursued a lease-by-application known as West Antelope III LBA. There are approximately five years remaining in the leasing process, then another two to four year permitting process. The coal underlying West Antelope III LBA is administered by BLM, and the overlaying surface is owned by NTEC or leased by NTEC from the State of Wyoming. The BFO RMPA summarily terminates the West Antelope III LBA. If Antelope Mine is required to recommence the West Antelope III LBA there is not sufficient time under the onerous leasing and permitting process to complete the West Antelope III LBA before the Antelope Mine ceases mining coal in 2042.

7.     The adoption of the BFO RMPA and MCFO RMPA causes immediate and irreparable harm to NTEC's operations at the Spring Creek Mine and Antelope Mine and to NTEC's business overall. With the federal coal supply uncertain, NTEC's utility coal customers will have uncertainty regarding future coal deliverables; therefore, such utility customers will make future investment decisions moving away from coal. It takes several years for a utility customer to pivot away from coal toward a new fuel source through operational modifications, capital improvements, and regulatory approval for such changes by their respective state and federal regulatory agencies. NTEC's utility customers will need to make these decisions very soon, if not already, if their future coal supply from NTEC is at risk of elimination in the next decade. In fact,

forcing NTEC's customers to eliminate coal as a fuel source and prematurely terminate NTEC's business is the purpose of the BFO RMPA and MCFO RMPA.

8.     Petitioner National Mining Association ("NMA") is a non-profit trade association organized under the laws of the State of Delaware with its principal place of business in Washington, D.C. The NMA is the only national trade organization that serves as the voice of the U.S. mining industry—and the hundreds of thousands of American workers it employs—before Congress, the federal agencies, the judiciary, and the media. NMA advocates for public policies that will help America fully and responsibly utilize its vast natural resources.

9.     America's mining industry supplies the essential materials necessary for nearly every sector of our economy – from technology and healthcare to energy, transportation, infrastructure, and national security. The NMA has a membership of more than 250 companies and organizations involved in every aspect of mining in the United States. NMA's members work to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security, and economic security, all delivered under world-leading environmental, safety, and labor standards.

10.     As of 2023, NMA member companies represented 75 percent of U.S. coal production in 18 states. NMA's members include companies operating coal mines that lease federal coal in both the BFO and MCFO. NMA's members will not be able to expand their coal reserves with federal coal beyond their current life of mine under the BFO and MCFO RMPAs. With increased electrification and as our economy and population expand, the nation's need for electricity will continue to grow. Much of the nation's coal production comes from federal leases in Western states including Wyoming and Montana. If this affordable coal is not available, high costs for alternative fuels will result in higher electricity costs and lower reliability.

11.     NMA's membership includes nearly every coal company doing business in the PRB. Therefore, the NMA and its members are directly adversely affected by the coal leasing ban in the RMPAs for Buffalo and Miles City. Together, the BFO RMPA and MCFO RMPA establish a moratorium on federal coal leasing in the PRB, one of the nation's most prolific and important coal regions. Such disruption would cause devastating economic harm to NMA's coal producer members, as well as NMA's members that serve the coal industry. Furthermore, BLM's short-sighted approach ignores the nation's continued need for federal coal to provide affordable and reliable electricity.

12.     NTEC and the NMA have statutory standing to bring this Petition for Judicial Review because their interests, and the interests of NMA's members, fall within the zones of interest for the relevant statutes – FLPMA, SMCRA, and the MLA.

13.     FLPMA recognizes a set of uses within the primary purpose of the statute. It defines the term "principal or major uses" which "includes, and *is limited to*, domestic livestock grazing, fish and wildlife development and utilization, *mineral exploration and production*, rights-of-way, outdoor recreation, and timber production." 43 U.S.C. § 1702(*l*) [emphasis added]. Impairment of a party's ability to use lands administered under FLPMA is an injury within the zone of interests of the statute, as is denial of procedures required by FLPMA. *See State of Utah v. Babbitt*, 137 F.3d 1193, 1215–16 (10th Cir. 1998).

14.     Similarly, SMCRA finds that "coal mining operations presently contribute significantly to the Nation's energy requirements[,]" 30 U.S.C. § 1201(b), and  "surface and underground coal mining operations affect interstate commerce, contribute to the economic well-being, security, and general welfare of the Nation and should be conducted in an environmentally sound manner" 30 U.S.C. § 1201(j). One of the purposes of SMCRA is "to assure that the coal supply essential to the

Nation's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy." 30 U.S.C. § 1202(f). Courts have had little difficulty finding that companies that mine coal fall within SMCRA's zone of interests. *See*, *e.g.*, *Nat'l Coal Ass'n v. Lujan*, 979 F.2d 1548, 1552 (D.C. Cir. 1992).

15.     The Mineral Leasing Act, as amended, in providing that coal deposits "*shall* be subject to disposition in the form and manner provided by this chapter to citizens of the United States," 30 U.S.C. § 181 (emphasis added), and in setting forth detailed procedures for the issuance of coal leases, likewise places coal lessors within its zone of interests. The purpose of the MLA was "'to promote the orderly development of the oil and gas deposits in the publicly owned lands of the United States through private enterprise.'" *Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967). The statute designates potential lessors as "persons entitled to benefits" of the statute, closely tracking the general test for statutory standing. *Id.*; *cf. Nat. Res. Def. Council, Inc. v. Jamison*, 787 F. Supp. 231, 244 (D.D.C. 1990) (holding that zone of interests inquiry under MLA is whether "there is *any* indication, however attenuated, that Congress intended to benefit such a class of plaintiffs.").

## II.    JURISDICTION AND VENUE

16.     Petitioners are seeking injunctive and declaratory relief under the APA for violations of FLPMA, the MLA, SMCRA, the Jones Act of 1927, the Omnibus Enabling Act of February 22, 1889, and the Wyoming Admission Act. Accordingly, this Court has federal question jurisdiction to adjudicate the subject matter of this dispute. *See* 28 U.S.C. § 1331. The federal government has waived sovereign immunity in the APA, 5 U.S.C. § 702.

17.    Venue is proper in this district because it is a judicial district in which a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(e)(1)(B). The BFO RMPA and MCFO RMPA manage the Wyoming and Montana energy-producing region known as the PRB together under the same management approach to ban coal leasing throughout both planning areas. The two RMPAs were developed jointly and simultaneously to achieve one integrated decision, banning coal leasing throughout the PRB. Substantial regulatory action and decisions were made in this district by federal agency employees, including within the BFO in Buffalo, the High Plains District Office in Casper, and the Wyoming State office in Cheyenne. NTEC owns and operates two mines within the BFO Planning Area and one mine in the MCFO Planning Area, so a substantial part of the events giving rise to the harm incurred by NTEC will occur in Wyoming. Additionally and alternatively, venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A), as defendant Archuleta resides in this district.

### III.    FACTS

A.  Powder River Basin

18.    The preceding allegations are restated and incorporated herein by this reference.

19.    The PRB region spans portions of Wyoming and Montana. The PRB is the largest coal-producing region in the United States, accounting for approximately 76.5 percent of total coal production in the entire Western United States and 43.5 percent of total coal production in the United States. Nearly all of the coal resources within the PRB are held by the United States and managed by the BLM as federal coal. The PRB produces 85 percent of the federal coal available in the country. The two RMPAs at issue here govern a total of 16.4 million acres of subsurface federal mineral estate.

20.     Federal coal mined in the PRB generates an enormous direct economic contribution to the United States, the States of Wyoming and Montana, as well as, counties and municipal governments. The direct economic contribution from development of federal coal resources within the PRB includes rents, royalties, taxes, and bonus bids. The estimated federal royalties from coal production in the PRB in 2021 was nearly $350 million. Portions of the collected royalties are returned to State and local governments to fund public institutions, such as hospitals, first responders, and educational institutions.

21.     Federal coal also generates state and local tax revenue. The estimated state severance tax paid to Montana and Wyoming from coal mining in 2021 was nearly $200 million. The severance tax is paid directly to State and local governments for various public institutions and projects. Wyoming and Montana also collect other types of local taxes such as *ad valorem* tax and excise tax on coal production. The total estimated *ad valorem* tax assessed on coal production in the PRB was $350 million in 2021. Montana assessed another $7.5 million in 2021 as a gross proceeds tax.

22.     Federal coal mined in the PRB also generates indirect economic contributions to the United States, States of Wyoming and Montana, and counties and the local governments therein through jobs and indirect economic contributions to the communities where mines are located. Federal coal mining in the PRB generates an estimated direct and indirect economic contribution to the PRB region of nearly $3 billion.

23.     While most of the coal within the PRB is federally owned, the surface estate is largely in non-federal ownership. Surface owners include the States of Wyoming and Montana and private individuals and entities, including NTEC. The PRB also contains some subsurface mineral interests owned by the States of Montana and Wyoming, as well private individuals and Indian tribes.

B. <u>State Grant Lands</u>

24.     When Montana was admitted to the Union, Congress directed that "upon admission of each of said State into the Union sections numbered sixteen and thirty-six in every township of said proposed States . . . are hereby granted to the States for the support of common schools[.]" Omnibus Enabling Act of February 22, 1889, 50th Cong., 2d sess., ch. 180, 25 Stat. 676. Upon approval of Montana's 1889 Constitution, its statehood was proclaimed consistent with the Enabling Act and the grants vested with the State. President Benjamin Harrison, Proclamation 293—Admission of Montana Into the Union (Nov. 8, 1889). At the time of statehood, mineral lands were excluded from the grants. Omnibus Enabling Act, § 18, 25 Stat. 681–82. As directed by the Enabling Act, the State of Montana holds these lands in trust for the benefit of the people of Montana with a fiduciary duty to maximize returns. *State ex rel. Thompson v. Babcock*, 147 Mont. 46, 409 P.2d 808 (1966); Mont. Const. Art. X, § 11.

25.     Similarly, when Congress admitted Wyoming as a State, Congress provided "that sections numbered sixteen and thirty-six in every township of said proposed State . . . are hereby granted to said State for the support of common schools[.]" Wyoming Admission Act, § 4, 51st Cong., 1st sess., ch. 664, 26 Stat. 222, 223 (July 10, 1890). Mineral lands were excluded from the statehood grants. *Id.* § 13. Wyoming school grant lands are subject to a trust duty. *Riedel v. Anderson*, 2003 WY 70, 70 P.3d 223. Although the Wyoming Supreme Court held that the Admission Act does not create a fiduciary duty, that question is a matter of federal law and the Wyoming Supreme Court's holding in *Riedel* is not binding on this Court.

26.     In the Jones Act of 1927, Congress expanded the school grants to States to include the mineral interests, including coal, contained in the numbered sections (16 and 36 for Wyoming and

Montana). Act of Jan. 25, 1927, Pub. L. No. 29-570, 44 Stat. 1026; 43 U.S.C. § 870. States may lease but may not sell these mineral interests. *Id.*

27.     Congress, as expressed by the Jones Act of 1927, clearly intends each State to develop its coal resources for the benefit of public institutions such as common schools. Indeed, the Omnibus Enabling Act and Wyoming Admission Act established, as a matter of federal law, the States' fiduciary duty to develop those mineral resources.

28.     Because state school lands are granted in isolated sections, they are physically intermingled with lands where the federal government retains the mineral estate. Accordingly, economic development of resources on the state lands can only proceed in connection with development on federal lands such as state coal sections surrounding Spring Creek Mine's pending SCM LBA II.

      C.     Federal Legal Framework

29.     Congress passed the MLA in 1920, 41 Stat. 437, Pub. L. No. 66-146 (Feb. 25, 1920) ; 30 U.S.C. §§ 181 et seq. Its purpose is "to promote the mining of coal" and other minerals on the public domain. 41 Stat. 437 (1920) (preamble). The MLA mandates that "[d]eposits of coal . . . shall be subject to disposition in the form and manner provided by this Chapter to the citizens of the United States[.]" 30 U.S.C. § 181.

30.     In the MLA, as amended by the FCLAA, 90 Stat. 1083, Pub. L. No. 94-377 (Aug. 4, 1976), Congress directed the Secretary of the Interior ("Secretary") to adopt rules for coal leases according to a prescribed process for managing federal lands. 30 U.S.C. § 189; 30 U.S.C. § 201. Congress also directed the Secretary to develop "comprehensive land-use plans" in areas suitable for coal development and to hold coal lease sales consistent with the plans. 30 U.S.C. § 201(a)(3). Each plan "shall include an assessment of the amount of coal deposits in such land, identifying the amount of such coal which is recoverable by deep mining operations and the amount of such coal

which is recoverable by surface mining operations." 30 U.S.C. § 201(a)(3)(B). The Secretary may not accept a bid for a lease which is less than the fair market value. 30 U.S.C. § 201(a)(1). And a mining plan of operation may not be approved unless it is "found to achieve the maximum economic recovery of the coal within the tract." 30 U.S.C. § 201(a)(3)(C). The Secretary delegated her authority relevant here to BLM.

31.    The Mining and Minerals Policy Act of 1970 declared that "it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in … the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs." 30 U.S.C.A. § 21a(2). It further provides that "[i]t shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section." 30 U.S.C. § 21a. The Secretary delegated her authority relevant here to the BLM.

32.    FLPMA provides a planning and management framework for BLM's administration of federal lands. It does not repeal or amend the MLA or Mining and Minerals Policy Act. FLPMA section 701(f) further provides that "[n]othing in this Act shall be deemed to repeal any existing law by implication." 90 Stat. 2786; 43 U.S.C. § 1701 note.

33.    FLPMA requires BLM to manage federal lands and minerals under principles of "multiple use and sustained yield[,]" 43 U.S.C. § 1701(a)(7). In developing Resource Management Plans ("RMPs"), BLM shall "use and observe the principles of multiple use and sustained yield set forth in [FLPMA] and other applicable law[.]"  43 U.S.C. § 1712(c)(1).

34.    "[M]ultiple use means the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs

of the American people; *making the most judicious use* of the land for some or all of these resources or related services *over areas large enough* to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; *a combination of balanced and diverse resource uses* that takes into account the long-term needs of future generations for renewable and *nonrenewable resources,* including, but not limited to, recreation, range, timber*, minerals,* watershed, wildlife and fish, and natural scenic, scientific and historical values*;* and *harmonious and coordinated management of the various resources* without permanent impairment of the productivity of the land and the quality of the environment." 43 U.S.C. § 1702(c) (emphasis added).

35.    Sustained yield means "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h).

36.    FLPMA includes a Congressional statement of policy that "the Congress exercise its constitutional authority to withdraw or otherwise designate or dedicate Federal lands for specified purposes and that Congress delineate the extent to which the Executive may withdraw lands without legislative action…." 43 U.S.C. § 1701(a)(4). To that end, the statute repeals the President's implied authority to withdraw lands from the public domain recognized in *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). FLPMA § 704(a), 90 Stat. 2792.

37.    In FLPMA, Congress prohibited the Executive Branch from withdrawing land greater than 5,000 acres without complying with strict statutory procedures, by defined politically accountable positions within the Secretary of the Interior, and subject to notification and subsequent approval by Congress. 43 U.S.C. § 1714. A withdrawal under FLPMA means "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws,

for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program[.]" 43 U.S.C. § 1702(j).

38.     FLPMA requires the BLM to develop comprehensive RMPs subject to a robust public participation process. 43 U.S.C. § 1712. The public participation regulations require the Secretary to release a draft RMP and Final Environmental Impact Statement for public notice and comment. 43 C.F.R. § 1610.2(f). The Field Manager is required to identify a preferred alternative that best meets Director and State Director guidance. 43 C.F.R. § 1610.4-7. The identification of a preferred alternative allows the public to meaningfully comment on the RMP prior to a final decision in the Record of Decision ("ROD").

39.     FLPMA limits the Secretary's discretion with regard to any decision that "excludes (that is, totally eliminates) one or more of the principal or major uses for two or more years with respect to a tract of land of one hundred thousand acres or more." 43 U.S.C. § 1712(e). Any such decision must be reported to Congress and rescinded if a concurrent resolution of disapproval is passed within 90 days. *Id.* FLPMA does not permit the use of land management planning as a subterfuge to conduct a withdrawal.

40.     FLPMA directs RMPs to include principles of multiple use from "other applicable law[.]" With respect to federal coal leasing, "other applicable law" means SMCRA and the MLA. SMCRA directs the Secretary to identify those areas on Federal lands that are not suitable for coal mining according to Section 522 of SMCRA, 30 U.S.C. § 1272. The Secretary is only permitted to withdraw an area as unsuitable for all or certain types of surface coal mining operations if reclamation "is not technologically and economically feasible," 30 U.S.C. § 1272(a)(2), or if certain types of surface mining operations will:

(A) be incompatible with existing State or local land use plans or programs; or

(B) affect fragile or historic lands in which such operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems; or

(C) affect renewable resource lands in which such operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, and such lands to include aquifers and aquifer recharge areas; or

(D) affect natural hazard lands in which such operations could substantially endanger life and property, such lands to include areas subject to frequent flooding and areas of unstable geology.

30 U.S.C. § 1272(a)(3).

41.     The Secretary adopted regulations to implement FLPMA and SMCRA to achieve the MLA's objective of making coal available for leasing for the purpose of energy production. 43 C.F.R. § 3400.0-3. The Secretary delegated her authority relevant here to the BLM. The regulations provide a coal screening process by which BLM will determine in a land use plan what areas are acceptable for further consideration for coal leasing. 43 C.F.R. § 3420.1-4(e).

42.     The first step is to determine coal development potential by applying the coal screening process. 43 C.F.R. § 3420.1-4(e)(1). Coal screen three provides that "multiple land use decisions shall be made which may eliminate additional coal deposits from further consideration for leasing to protect other resource values and land uses that are locally, regionally, or nationally important or unique[.]" 40 C.F.R. § 3420.1-4(e)(1). There is nothing in coal screen three or the coal leasing statutes it implements that give the Secretary discretion to ban coal leasing for greenhouse gas ("GHG") emission or global climate change since they are not "resource values or land uses" provided by the land.

43.     Second, BLM must determine whether any areas are unsuitable for surface mining pursuant to SMCRA section 522, using the procedures in 43 C.F.R. Part 3460. 43 C.F.R. § 3420.1-4(e)(2). The Part 3460 regulations require that the deciding official "shall make his/her assessment on the best available data that can be obtained given the time and resources available to prepare the plan." 43 C.F.R. §§ 3461.2-1(b)(1). The regulations provide twenty criteria to apply in determining whether lands are unsuitable. 43 C.F.R. § 3461.5. The twenty suitability criteria, which include areas within the National Park System, 43 C.F.R. § 3461.5(a), areas hosting falcon nests, 43 C.F.R. § 3461.5(m), and numerous other qualities, address only the attributes of the land. The screening criteria do not contemplate or permit an unsuitability determination based on effects of leasing outside the planning area, much less a determination due to effects on climate change from emission of GHGs.

44.     Third, BLM may make land use decisions on the basis of multiple use "which may eliminate additional coal deposits from further consideration for leasing to protect other resource values and land uses that are locally, regionally or nationally important or unique and that are not included in the unsuitability criteria…." 43 C.F.R. § 3420.1-4(e)(3). By referring to these decisions as "Multiple land use decisions," the regulation explicitly provides that the decision must be made on the basis of conflicts with other resource uses in the planning area.

45.     Fourth and finally, the screening process directs BLM to consult with other surface estate owners in the planning area. 43 C.F.R. § 3420.1-4(e)(4).

        D.  The RMPAs.

46.     The BLM manages the PRB as two planning areas under the FLPMA – the MCFO Planning Area and the BFO Planning Area. The MCFO Planning Area includes 17 counties in eastern Montana. Nearly all of the coal in the MCFO Planning Area is owned by the federal government.

The BFO Planning Area consists of Campbell and Converse Counties, Wyoming. Nearly all of the coal in the BFO Planning Area is owned by the federal government. The RMPAs do not purport to manage surface use of federal lands. Rather, the RMPAs only address the use of federal coal for which the only feasible use of PRB coal is energy production.

47.    On May 8, 2023 BLM issued the draft RMPA and EIS for the BFO and MCFO Planning Area. Notices of Availability were also published in the *Federal Register*. 88 Fed. Reg. 29689 and 29691 (May 8, 2023).

48.    The MCFO RMPA contained four alternatives with two preferred alternatives, both of which significantly reduced coal available for lease. The first alternative (Alternative A) was a No Action Alternative leaving the management decisions regarding coal from the 2015 RMP/Final EIS in place. The second proposed alternative (Alternative B) was a "limited leasing option" that provided a 2-mile area around existing federal min plan boundaries. The third proposed alternative (Alternative C) was also a "limited leasing option" but it only permitted coal leasing for pending lease-by-applications. The fourth proposed alternative (Alternative D) banned all future coal leasing and terminated all pending lease-by-applications. The BLM chose Alternatives B and D as co-preferred alternatives but noted that the Final SEIS and adopted RMPA may select various components of each of the alternatives analyzed in the Draft SEIS. As a result, it was impossible to know which alternative, or components of the alternatives, were being proposed for purposes of public participation. Both preferred alternatives significantly reduced the federal coal available for lease.

49.    The BFO RMPA proposed three potential alternatives with two preferred alternatives. The first alternative (Alternative A) was a No Leasing Alternative where no future leasing would be permitted within the planning area and all pending lease-by-applications would be terminated. The

second alternative (Alternative B) was a No Action Alternative which adopted the same coal management decisions as the preceding Resource Management Plan. The third alternative (Alternative C) was a limited leasing option where 1.24 billion short tons of BLM-administered recoverable coal would be available for future leasing consideration and any pending applications would need to be reduced to accommodate the leasing needs of all coal mines within the planning area. The BLM chose Alternatives A and C as co-preferred alternatives but noted that the Final SEIS and adopted RMPA may select various components of each of the alternatives analyzed in the Draft SEIS. As a result, it was impossible to know which alternative, or components of the alternatives, were being proposed for purposes of public participation. Both preferred alternatives significantly reduced the federal coal available for lease.

50.     NTEC and the NMA both timely commented on the two draft BFO RMPA and MCFO RMPA and related DEISs. True and accurate copies of NTEC's comment letters for both RMPAs are attached hereto as Exhibit "A" and incorporated herein by this reference. True and accurate copies of NMA's comment letters for both RMPAs are attached hereto as Exhibit "B" and incorporated herein by this reference.

51.     On May 17, 2024, BLM published proposed RMPAs and FEISs for the Buffalo and Miles City Field Offices Planning Areas. Both Proposed RMPAs proposed to ban all future coal leasing and terminate pending leases by application that do not qualify for valid existing rights. There were no substantive changes to the proposed FEIS/RMPA from the draft EIS/RMPA.

52.     NTEC and the NMA timely filed protests of the proposed RMPAs pursuant to 43 C.F.R. § 1610.5-2. True and accurate copies of NTEC's Protest Letters for both RMPAs are attached hereto as Exhibit "A" and incorporated herein by this reference. True and accurate copies of

NMA's Protest Letters for both RMPAs are attached hereto as Exhibit "B" and incorporated herein by this reference.

53.    On November 13, 2024, BLM issued the Director's Protest Resolution Report for both RMPAs. BLM recognized NTEC's and NMA's protests as valid and timely protests. However, it denied both protests regarding the two RMPAs. It also denied every other protest regarding the two RMPAs.

54.    On November 20, 2024, BLM Director Stone-Manning signed the RODs for both the MCFO RMPA and BFO RMPA. A notice of these decisions was published in the *Federal Register* at 89 Fed. Reg. 93,650 (Nov. 27, 2024).

55.    Both RODs selected the alternative that prohibits new coal leasing in the subject planning area. The RODs explicitly state that in selecting these alternatives the agency makes further BLM-administered coal unavailable for coal leasing and mandated BLM's termination of pending lease by applications such as NTEC's SCM LBA II and West Antelope III.[1] The MCFO ROD states that the RMPA makes unavailable "1,745,040 acres of BLM administered coal from further consideration for leasing in order to reduce GHG emissions as a proxy for climate change."[2] Similarly, the BFO ROD "makes 48.12 billion short tons of coal unavailable for further leasing consideration in order to reduce GHG emissions as a proxy for climate change."[3]

56.    The RMPAs contain a single paragraph that can be considered a land use planning analysis and decision. The remainder of the RMPAs exclusively contain the FEIS required by the National Environmental Policy Act ("NEPA") analyzing the various environmental effects of the alternatives without any specificity regarding the proposed RMPA alternative. The BLM conflated

---

[1] MCFO ROD at 1-4; BFO ROD at 1-1.
[2] MCFO ROD at 1-4.
[3] BFO ROD at 1-1.

its obligation to make coal available for leasing under FLPMA, SMCRA, and the MLA with BLM's distinct obligation to consider the reasonable foreseeable effects of its decision.

57.     The selected RMPAs also ban all pending Lease-by-Applications. Only existing leases will be allowed to continue. Leases in the multi-year application process will be summarily terminated including pending LBAs submitted by NTEC. The RODs dictate that leases in the multi-year application process will be summarily terminated.

58.     The decision rationale in both RODs cites to Executive Orders 13990 and 14008 and to Secretarial Order 3399, all of which relate to climate policy, and claim that the RMPAs are consistent with a national long-term strategy to reach net-zero greenhouse gas emissions by 2050.[4]

59.     Both RODs also claim that market conditions provide a rationale to ban coal leasing within these planning areas. The MCFO ROD asserts that "an overall market decline" and the BFO ROD claims that "continuous reduced production levels" mean that future coal leasing is "not necessary" through the end of the planning period.[5]

60.     The planning process for both Field Offices incorporated an analysis of the coal screening criteria under SMCRA and implementing regulations. First, it determined which areas had potential for surface mining. For MCFO, the agency identified 1,745,040 acres, and for BFO it identified 413,250 acres.[6] At the second screen, BFO identified 23,940 acres as unsuitable without exception; MCFO identified 202,325 such acres.[7]

61.     For coal screen three, the two RMPAs diverged wildly. BFO only excluded areas due to demonstrable conflicts in use, constituting a municipal airport and a special recreation

---

[4] BFO ROD at 1-2; MCFO ROD at 1-4.
[5] BFO ROD at 1-2; MCFO ROD at 1-5.
[6] MCFO ROD at A-3; BFO ROD at A-4.
[7] MCFO ROD at 2-1.

management area.[8] While the BFO ROD considered air quality, which is referenced in the regulation,[9] but it determined that the criteria did not support exclusion of any other areas from mining since no air quality standards had been exceeded.[10] At the conclusion of the screening process, BFO identified 388,430 acres as suitable for leasing holding 48.01 billion short tons of coal.[11] Yet in its final decision, the BFO ROD adopted the No Leasing alternative, citing to no statute but only to Executive Branch policy goals and directives to reduce GHG emissions as a proxy for climate change.[12]

62.    While the BFO ROD at least acknowledged that BLM is making a pure policy decision, the MCFO ROD engaged in a sleight-of-hand. At the third screen, MCFO shoehorned climate change into the multiple-use decision, stating that BLM "applied a climate change criterion" to eliminate all leasing.[13] MCFO replaced the regulation's term "air quality" with the more generic "air resources" to justify eliminating 1.7 million acres.

63.    The intent of both the MCFO and BFO FEIS/RMPA is to eliminate coal as a fuel source for the electric utility industry in order to meet politically-driven Executive policies on climate change, notwithstanding that the MCFO and BFO FEIS/RMPAs violate long-standing Congressional policy, implemented by numerous statutes, to develop coal resources for energy such as the obligation under FLPMA to provide for multiple use, the MLA's obligation to make

---

[8] BFO ROD at A-7.
[9] The screen 3 regulation provides in part: "In making these multiple use decisions, the Bureau of Land Management or the surface management agency conducting the land use planning shall place particular emphasis on protecting the following: Air and water quality; wetlands, riparian areas and sole-source aquifers; the Federal lands which, if leased, would adversely impact units of the National Park System, the National Wildlife Refuge System, the National System of Trails, and the National Wild and Scenic Rivers System." 43 C.F.R. § 3420.1-4(e)(3).
[10] BFO ROD at A-6.
[11] BFO ROD at A-9.
[12] BFO ROD at 1-2.
[13] MCFO ROD at A-7, A-8.

leasing of coal available for energy production, and SMCRA's obligation to only determine coal unsuitable for leasing under the coal screening criteria. BLM simply concluded that additional leasing of federal coal "is not necessary" based upon the analysis in the Final SEIS. Neither the MCFO nor the BFO FEIS/RMPA relied upon any other factual or legal basis to ban coal leasing within the two planning areas. BLM's decision simply ignored all statutory and regulatory criteria when engaged in land use planning by considering factors, entirely outside BLM's control, such as global climate change to ban leasing of federal coal and terminate pending LBAs like SCM LBA II and West Antelope III.

64.     Based on coal screen three for multiple use, both RMPAs conclude that the volume of GHG emissions will result in climate change impacts that affect other resource values within the planning area. Simultaneously, however, both RMPAs concluded that the ban on future coal leasing will not alleviate climate change impacts to other resource values within the planning area due to global sources of GHG emissions outside the control of BLM. In other words, BLM chose a means to an end, like a ban on coal leasing to protect other resource values, but ultimately BLM admitted that such a means has no causal relationship to the end. This decision is entirely contrary to coal screen three analyzing multiple use because it fails to establish any causal relationship between the ban on federal coal leasing in the planning area and the protection of other resource values.

65.     Finally, both the BFO RMPA and MCFO RMPA conclude that further coal leasing is "not necessary" because domestic utility customers will be closing their coal fired generating units. First, as detailed in NTEC's and NMA's comments, BLM's statement in this regard is factually inaccurate because the deadlines set for closure of coal fired generating units are much later than reported in the RMPAs, if known at all. Further, BLM's assessment of coal market demand does

not account for international sales for which there remains strong demand. Second, there is nothing in FLPMA, SMCRA, or the MLA that gives BLM discretion to consider the market availability of coal as the sole basis to make land use planning decisions for coal leasing to achieve multiple use and sustained yield. Third, the BLM failed to consider the demand from international markets as a large percentage of Spring Creek Mine's coal sales are shipped abroad where demand continues to remain strong. Fourth, the BLM failed to consider the ever-evolving schedule of coal fired generating unit closures or the opportunity for utility customers and their rate payers to change their approach based upon energy demand and pricing. Fifth, BLM fails to account whatsoever that many domestic coal fired generating units are currently not scheduled to close.

66.     The RODs represent the final decisions of the Secretary regarding planning in the subject areas. True and accurate copies of the RODs with the corresponding RMPAs are available here (BFO ROD & RMPA)

https://eplanning.blm.gov/public_projects/2021239/200533937/20123692/251023672/BFO%20 and here (MCFO ROD & RMPA)

https://eplanning.blm.gov/public_projects/2021155/200534253/20123920/251023900/2024_MCFO%20ROD_20241120_508.pdf.

67.     True and accurate copies of the Final Environmental Impact Statements for the BFO RMPA and the MCFO RMPA are available here:

(BFO FEIS)

https://eplanning.blm.gov/public_projects/2021239/200533937/20110491/251010482/BFO_FSEIS_508.pdf

and here (MCFO FEIS)

https://eplanning.blm.gov/public_projects/2021155/200534253/20110900/251010891/MCFO_Final%20SEIS_Proposed%20RMPA_508.pdf.

## IV.    CLAIMS

### Allegations Common to All Claims

68.    All preceding allegations are hereby incorporated by reference.

69.    The MCFO ROD and the BFO ROD are each a final agency action subject to judicial review under the APA, 5 U.S.C. § 704.

70.    As applicable here, section 706(2) of the APA directs a reviewing court to "hold unlawful and set aside agency action" that is:

>    (A)  arbitrary,  capricious,  an  abuse  of  discretion,  or  otherwise  not  in accordance with law;

>    (B) contrary to constitutional right, power, privilege, or immunity;

>    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>    (D) without observance of procedure required by law;

>    * * *.

5 U.S.C. § 706(2).

71.    An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

72.     The BFO ROD and MCFO ROD must be set aside because they fail to meet statutory and procedural requirements, they are arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2).

### First Claim for Relief

### (Action Contrary to Law—FLPMA)

73.     All preceding paragraphs are incorporated by reference.

74.     By adopting the no-leasing alternatives in the RMPAs, the Respondents violated the multiple-use mandate of FLPMA and considered factors that are unrelated to conflicts of use. It chose complete cessation of a use rather than balancing the use against other considerations.

75.     By adopting the no-leasing alternatives in the RMPAs, the Respondents effectively decided to conduct a FLPMA withdrawal in violation of FLPMA's procedural and substantive standards for a withdrawal.

76.     Accordingly, the BFO ROD and MCFO ROD are contrary to law and thus should be set aside pursuant to APA sections 706(2)(A) and 706(2)(C).

### Second Claim for Relief

### (Action Contrary to Law—SMCRA)

77.     All preceding paragraphs are incorporated by reference.

78.     Respondents violated SMCRA by considering factors that are not prescribed by Congress for coal leasing suitability, multiple use, and coal screening criteria. Specifically, Respondents improperly considered the effects of global climate change, the potential closure of coal fired generating units, and other factors outside Respondents statutory authority.

79.     Respondents violated SMCRA by relying solely on Executive policy and improperly ignored the directives of Congress in SMCRA's multiple use, suitability, and coal screening criteria.

80.     Respondents violated SMCRA by banning all coal leasing and terminating pending LBAs in the planning area contrary to Congress' intent to provide for surface coal mining for energy production.

81.     Accordingly, the BFO ROD and MCFO ROD are contrary to law and thus should be set aside pursuant to APA sections 706(2)(A) and 706(2)(C).

### Third Claim for Relief

### (Action Contrary to Law—MLA)

82.     All preceding paragraphs are incorporated by reference.

83.     The MLA requires the Secretary to make coal available for mining to the citizens of the United States. The FCLAA further clarified that the Secretary shall identify those areas for suitable for coal mining and lease the coals pursuant to comprehensive land use plans.

84.     The Respondents violated the MLA and FCLAA by banning all coal leasing and terminating pending LBAs, such as SCM LBA II and West Antelope III in the BFO and MCFO RMPAs.

85.     Accordingly, the BFO ROD and MCFO ROD are contrary to law and thus should be set aside pursuant to APA sections 706(2)(A) and 706(2)(C).

### Fourth Claim for Relief

### (Action Contrary to Law—Jones Act of 1927, Omnibus Enabling Act, Wyoming Admission Act)

86.     All preceding paragraphs are incorporated by reference.

87.    By isolating and precluding economic utilization of state mineral sections granted from the federal government, the Respondents violated the Jones Act of 1927, the Omnibus Enabling Act, and Wyoming Admission Act.

88.    Accordingly, the BFO ROD and MCFO ROD are contrary to law and thus should be set aside pursuant to APA sections 706(2)(A) and 706(2)(C).

## Fifth Claim for Relief

### (Arbitrary and Capricious Agency Action)

89.    All preceding paragraphs are incorporated by reference.

90.    In making its decisions on the BFO and MCFO RMPAs, the agency imposed a "climate change criterion" that is not supported by any statute or regulation. It misinterpreted its own coal screening regulations in support of the decisions and did so in inconsistent ways.

91.    In both RODs, the agency misrepresented and/or misinterpreted market conditions, asserting decline in demand for federal coal despite strong continued demand for coal from NTEC and NMA members.

92.    BLM asserted that eliminating PRB leasing was important to reducing GHG emissions and climate change. However, BLM ignored comments and clear evidence that eliminating PRB leasing will not reduce global coal production, GHG emissions, or climate change. Thus the central rationale of the RODs and RMPAs is illusory.

93.    Accordingly, the BFO ROD and MCFO ROD are arbitrary and capricious and should be set aside.

## Sixth Claim for Relief

### (Action Without Procedure as Required By Law)

94.    The preceding paragraphs are incorporated by reference.

95.    The BLM failed to comply with FLPMA's extensive procedural requirements for developing an RMPA. BLM failed to (1) circulate a proposed RMPA for comment because the entire draft document was dedicated to the FEIS without any land use planning and multiple use analysis as required by FLPMA, (2) identify a preferred alternative because the draft RMPA/FEIS contained two co-preferred alternatives and noted the possibility of combining numerous elements of each co-preferred alternative, and (3) provide notice required by FLPMA section 202(e) because the preceding omissions made it impossible to meaningfully engage in the public participation process.

96.    The RMPAs are equivalent to withdrawals of public land as defined by FLPMA section 103(j), 43 U.S.C. § 1702(j). This withdrawal was made unlawfully because none of the procedures in FLPMA section 204 were followed. Additionally, BLM lacked authority to make the withdrawals since FLPMA bars the agency from making withdrawals "which can be made only by Act of Congress…" 43 U.S.C. § 1714(j). The mandates of the MLA and SMCRA preclude administrative withdrawal of land from availability for coal leasing.

97.    Accordingly, the BFO ROD and MCFO ROD must be set aside.

## V.    REQUEST FOR RELIEF

98.    NTEC and NMA request that the Court provide the following relief:

a.    Petitioners request the Court grant their petition and enter relief under the APA and other applicable authority.

b.    Petitioners request the Court vacate the BFO RMPA and ROD and the MCFO RMPA and ROD.

c.    Petitioners request a declaration that the BFO RMPA and ROD and the MCFO RMPA and ROD are unlawful, arbitrary and capricious, and without procedure as required by law.

d.  Petitioners request an injunction prohibiting defendants from taking any action to implement the BFO RMPA and ROD and the MCFO RMPA and ROD. Petitioners further request such injunction to prohibit defendants from terminating any pending lease-by-application at the time the BFO RMPA and MCFO RMPA and their corresponding RODs became effective.

e.  Such other and further relief as the court deems just and equitable.

Respectfully submitted this 16th day of December, 2024.

/s/ Ryen L. Godwin
SCHWABE, WILLIAMSON & WYATT, P.C.
Ryen L. Godwin, WYSBA #8-06589
1420 5th Avenue, Suite 3400
Seattle, WA 98101
rgodwin@schwabe.com
206-622-1711
*Attorneys for Petitioners*

130242\288428\47016703.v1