**EXHIBIT A**

**EXHIBIT A**

# Schwabe

June 17, 2024

**Ryen L. Godwin**
Admitted in Washington, Montana and Wyoming
D: 206-689-1213
C: 206-643-4253
rgodwin@schwabe.com

SUBMITTED VIA *BLM NATIONAL NEPA REGISTER PORTAL*
TO DOCKET NO. DOI-BLM-WY-P070-2022-0115-RMP-EIS

Ms. Tracy Stone-Manning
Director
Bureau of Land Management
U.S. Department of the Interior
VIA: Online Submission

**Re:  Protest of the Buffalo Field Office Proposed Resource Management Plan Amendment and Supplemental Environmental Impact Statement.**

Ms. Stone-Manning:

Schwabe, Williamson & Wyatt, on behalf of Navajo Transitional Energy Company, LLC (NTEC), submits NTEC's protest of the Bureau of Land Management's (BLM's) Proposed Resource Management Plan Amendment (RMPA) and Supplemental Environmental Impact Statement (SEIS) for the Buffalo field office (collectively, the BFO SEIS/RMPA).  The address for NTEC's corporate headquarters is 385 Interlocken Crescent, Suite 400 Broomfield, CO 80021. NTEC's phone number is (702) 566-2900.

NTEC is a single member, limited liability company wholly owned by the Navajo Nation and incorporated under the laws of the Navajo Nation. NTEC was formed to promote the economic and financial interests of the Navajo Nation and its citizens, while remaining dedicated to responsible management of the Nation's natural resources.

NTEC's diversified energy portfolio includes coal mines on the Navajo Nation (Navajo Mine), in Montana (Spring Creek Mine, Big Horn County), and in Wyoming (Antelope Mine, Campbell and Converse Counties; and Cordero Rojo, Campbell County). As owners of these mines, the RMPA will directly and adversely impact NTEC by limiting NTEC's ability to obtain coal leases for federal coal in areas adjacent to the Antelope and Cordero Rojo mines. The impacts of the RMPA on these mines are acknowledged in the draft SEIS and RMPA.

NTEC provided detailed comments during the comment period for the draft SEIS. Unfortunately, after reviewing the RMPA, its clear BLM dismissed all of NTEC's comments. NTEC is protesting the RMPA, including the adequacy of the SEIS and BLM's selection of the No Leasing Alternative.  Among other parts of the RMPA and as discussed in more detail below, NTEC is protesting the selection of the No Leasing Alternative (BFO SEIS/RMPA, 2-1), the

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

reasonably foreseeable development under each of the alternatives (BFO SEIS/RMPA, Section 2-4), the rationale for that selection (BFO SEIS/RMPA, 2-5), the calculation of downstream emissions (BFO SEIS/RMPA, Sections 3.5.1 and 3.5.2), and the minimization of the socio-economic impacts of the proposed alternative (BFO SEIS/RMPA Section 3.5.3 and 3.5.4).

The specific grounds for the protests are provided below.  All of the issues were raised during the comment process before BLM issued the RMPA, and this protest relies upon the comments submitted during the public comment period. A copy of NTEC's comment letter is attached as <u>Exhibit A</u>.  A list of comments relied upon below and the name of the commentator is enclosed as <u>Exhibit B</u>.

**BLM's Resource Management Plan Amendment terminates federal coal leasing including pending lease applications, despite clear Congressional direction to the contrary in the Mineral Leasing Act.**

Under the No Leasing Alternative "only existing leases could be developed." BFO SEIS/RMPA, 2-1. As the BLM is well aware, the Powder River Basin (PRB) provides 85% of the federal coal in the United States, so the decision not to designate any lands outside of the existing leases as suitable for coal mining will effectively eliminating future mining of federally owned coal. That decision is directly contrary to the Mineral Leasing Act of 1920 (MLA) and the Mining and Minerals Policy Act of 1970 (MMPA), and the body of federal regulation implementing those statutes.  Congress has specifically directed that coal leasing shall be available in those areas suitable for such activity.  The Department of the Interior cannot render meaningless a body of federal legislation in a single executive action such as a resource management plan amendment.

The purpose of the MLA is "to promote the mining of coal" and other minerals on the public domain. MLA, 41 Stat. 437 (1920) (preamble). The MLA clearly states: "Deposits of coal . . . shall be subject to disposition in the form and manner provided by this Chapter to the citizens of the United States[.]"  30 USC § 181.  Similarly, the MMPA, directs the Secretary of the Interior to promote the development of domestic mineral resources.  30 USC § 21a.  This mandate further requires the Secretary of the Interior to implement Congressional policy through programs providing for the "orderly and economic development of" coal resources. *Id.*

The MLA, as amended by the Federal Coal Leasing Amendments Act (FCLAA), provides specific criteria for issuing coal leases.  Therein, Congress directed the Secretary of the Interior to adopt rules for coal leases according to a prescribed process for managing federal lands. 30 USC § 189; 30 USC § 201. Congress directed the Secretary of the Interior to develop a "comprehensive land-use plan" for coal development and prohibited the Secretary from implementing policy or regulations inconsistent with that plan.  30 USC § 201.  There is nothing in the MLA, FCLAA, or

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

MMPA permitting a total ban on coal development.  In fact, such a total ban entirely circumvents Congress' well expressed intent, and is contrary to well established law.

While the Secretary of the Interior certainly has discretion to implement the MLA, FCLAA, and MMPA in a manner consistent with NEPA, the statutes' clear mandate to make coal available for leasing to support domestic production leaves no discretion to ban coal leasing all together. The Secretary in this regard is amending federal statutes, with a single executive action, and without regard for the decision of elected officials in Congress.  It is not for the executive branch to make sweeping energy and mineral policy determinations, as BLM does with the RMPA, where Congress has already made the difficult policy decision to promote and develop the Nation's coal through federal leasing.

The BLM's reason to ban coal leasing here is similar to the reasons that were considered and rejected by the District of Louisiana in *State v. Biden*. *State v. Biden*, No. 2:21-cv-00778, 33-34 (W.D. Louisiana filed June 15, 2021).  In *State v. Biden*, the Biden Administration issued numerous executive orders, similar to those orders cited in the RMPA, to explore options to reduce fossil fuel development.  To implement these Executive Orders the Secretary of the Interior "paused" all federal oil and gas development on the Outer Continental Shelf.  States that rely upon oil and gas royalties challenged the pause as a violation of the MLA and Outer Continental Shelf Leasing Act (OCSLA).  The Court held:

> By stopping the process, the agencies are in effect amending two Congressional statutes. Neither the OCSLA nor the MLA give the Government Defendants' agencies the authority to [pause] lease sales.  Those statues require eligible oil and gas leases to continue to be sold in accordance with the statutes.  The Court finds that the stopping of leasing of eligible lands and waters is contrary to law.

*State v. Biden*, No. 2:21-cv-00778, pg. 33-34 (W.D. Louisiana filed Aug. 18, 2022).

NEPA requires federal agencies to consider the environmental impacts of their actions, but it does not authorize an agency to disregard laws passed by Congress just because it disagrees with the outcome. Whether or not there is a significant impact, BLM is still required to follow all of the pertinent laws and regulations when making its decision.  The BLM's decision to ban coal leasing in the Powder River Basin is contrary to law, the MLA, FCLAA, and MMPA in particular, among the other federal statutes promoting domestic coal development.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

**BLM's proposed decision under the RMPA violates FLPMA's multiple use mandate.**

FLPMA requires the Secretary to manage public lands for multiple uses, including mineral development, and to develop comprehensive land use plans incorporating these various uses. 43 U.S.C. §§ 1701(a)(7), 1712(c). FLPMA directs the Secretary to "use and observe the principles of multiple use and sustained yield" in developing land use plans. 43 U.S.C. § 1712(c)(1). BLM's ban on coal leasing fails to provide for "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment[.]" 43 CFR 1601.0-5(i). A complete ban fails to balance multiple uses by simply elevating a single use or resource value over all other uses. It is antithetical to principles of "multiple use and sustained yield" to impose a complete ban on the most significant revenue generating use of federal lands within the Powder River Basin like further coal leasing. 43 U.S.C. § 1712(c)(1).

BLM's application of the multiple use criteria in coal screening not only violates FLPMA's multiple use mandate, it is also completely arbitrary. The RMPA states:

> BLM applied a climate change criterion for air resources under Screen 3 (multiple-use) that considers climate change as a resource value unique or of local, regional, or national importance to develop a range of alternatives that meet the purpose and need. To that end, to eliminate federal lands based on a climate change criterion for air resources, the BLM anticipates by limiting future opportunities for federal coal leasing and development there may be a reduction in GHG emissions from combustion of new federal coal, which would thus reduce climate change effects.

Miles City Field Office Final SEIS and Resource Management Plan (MCFO RMPA), 2-1.[1]

First, climate change is not a resource value contemplated by FLPMA. FLPMA's multiple use standard refers to resource values specific to the land like open space, timber, minerals, water quality, wildlife, and air quality, not global climate change. *See* 43 USC § 1702, (c). BLM's attempt to shoehorn climate change into air resources contorts the plain language of the statute.

Second, BLM's conclusion that eliminating coal mining in the PRB will protect the climate change resource is arbitrary. The Multiple Use screen provides that "multiple use decisions shall

---

[1] BLM used the same coal screening air resource criteria for climate change in both the Miles City and Buffalo RMPAs. The Miles City RMPA is cited here because it more thoroughly describes BLM's analysis, than the Buffalo RMPA which omits any discussion of how BLM altered the Multiple Use Screen.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

be made which may eliminate additional coal deposits from further consideration for leasing *to protect* other resource values and land uses[.]"  43 CFR 3420.1-4(e)(3) [emphasis added].  The elimination of coal leasing will not "protect other resource values" such as air quality and public health impacts from greenhouse gas (GHG) emissions and/or climate change.  The RMPA states:

> In addition to BFO coal, the power plants may also burn coal produced outside the CDPA as well as nonfederal coal sources from the CDPA.  Therefore, the emissions presented are not necessarily due only to the combustion of BFO coal.

BFO SEIS/RMPA, 3-32.

This statement means that coal fired generation is not solely dependent on PRB coal so GHG emissions and corresponding climate change will continue until GHG emissions cease globally, rather than simply terminating coal leasing in the PRB.

It is patently arbitrary for BLM to choose a means to an end, like a ban on coal leasing to protect other resource values, where BLM admits that such a means has no causal relationship to the end.  There is not a single statement in either the MCFO RMPA or the Buffalo RMPA that links the reduction in coal from the planning area to the actual protection of some other resource value because power plants will find another source of fuel.

The Multiple Use screen is intended to resolve actual conflicts between uses like urban development on rangelands, mining through historic or cultural resources, or logging in critical habitat for a listed species.  The Multiple Use screen is not intended to act as a catch all for any and all environmental impacts occurring globally.  If BLM's position was correct, then BLM could prohibit logging on public lands in Montana to protect pollution from mills in China or prohibit ATVs on public lands in Wyoming to prevent pollution from manufacturing plants in Ohio.  BLM's action does not protect the climate change resource value, even if climate change could arguably be contemplated as a resource value in FLPMA.

Moreover, coal mine permits already require the permittee to protect other environmental resources such as air quality, land quality, water quality, and wildlife.  A mine operator is required to hold a Clean Air Act permit, a Clean Water Act water quality permit, a Surface Mining Control and Reclamation Act reclamation plan, a U.S. Army Corps of Engineers dredge and fill permit, and applicable wildlife protection and mitigation to prevent environmental impacts.  In other words, there are adequate protections for other resource values provided by public lands so a total ban is entirely arbitrary.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

BLM's attempt to fit a square peg into a round hole by using climate change as a resource value in the multiple use screen is a consequence of BLM's lack of statutory authority to provide a comprehensive solution to a complex and global phenomenon.[2]  The executive branch acting through the Secretary's limited FLPMA authority to conduct land use planning for coal development is simply not suited to unwind a century of Congressional policy to develop coal for energy production in the United States.

**BLM violated FLPMA's public participation process when preparing the RMPA.**

An important principle of FLPMA is public participation.  FLPMA requires "procedures, including public hearings where appropriate, to give . . . the public, adequate notice and opportunity to comment upon and participate in formulation of plans[.]"  43 USC § 1712(f).  Providing adequate notice and opportunity to comment means providing a draft of the resource management plan and an environmental impact statement analyzing certain plan alternatives. 43 CFR 1610.2(f).

BLM failed to comply with its public notice and participation requirements because it never released a copy of the Resource Management Plan Amendment for public comment.  It released a draft Supplemental Environmental Impact Statement in May of 2023, but the contents of the SEIS did not identify the proposed RMPA or analyze the coal screening criteria of the proposed RMPA.  At best, the SEIS identified potential alternatives, but it did not even identify a single preferred alternative.  Instead, BLM decided to identify two potential alternatives, depriving the public of the opportunity to comment on the actual plan BLM intended to implement and the FLPMA land use planning criteria intended to support that decision.

**BLM failed to provide a reasoned explanation for its decision to select the No Leasing Alternative.**

BLM must evaluate the impacts of each of the alternatives, and provide a reasoned explanation for its decision. However, the RMPA provided no explanation for why BLM chose the No Leasing Alternative. In the section titled "Rationale for Identifying a Proposed Plan Amendment" the closest thing that BLM provides to an explanation, is no explanation at all: "Collectively, the mines have sufficient federal coal leased to meet forecasted production levels

---

[2] The RMPA asserts that the Order in *Western Organizations of Resource Councils v. U.S. BLM* states "coal screening can, and must, take into account climate change."  First, to the extent the Order makes this assertion it is dicta as it applies to FLPMA.  The *WORC* case was about NEPA, not FLPMA so any statement of the law regarding FLPMA's coal screening was not properly before the court.  Second, the Court's discussion is simply stating that NEPA requires an assessment of climate change impacts.  It does not, however, state that FLPMA allows BLM to ban coal leasing all together.  In fact, as held by the Court in *State v. Biden*, the MLA prohibits a ban on coal leasing.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

into 2041." BFO SEIS/RMPA, 2-5. At best, this could be read as an implicit statement by BLM that federal coal mining should stop in 2041, although it is not clear why BLM believes that Congress put an expiration date on the MLA.

Even though the court required BLM to evaluate the environmental impacts of those alternatives, BLM must still give a reasoned explanation for choosing the No Leasing Alternative. BLM has provided a data dump, summarizing what it claims are the foreseeable impacts of each alternative. However, BLM never takes the requisite next step of providing meaningful discussion about why it ultimately chose the No Leasing Alternative. Such discussion is required under FLPMA and NEPA.

**BLM misstated the relative impacts of the different alternatives.**

Central to BLM's justification of its decision to block future leasing in the analysis area is its conclusion that that air quality in the downstream communities is significantly better under the No Leasing Alternative. Since the Powder River Basin produces some of the lowest sulfur coal in the world, BLM can only justify that conclusion if less coal is used in the downstream communities. Not only is that an absurd conclusion, it is a conclusion that contradicts BLM's own assumptions.

BLM is required to estimate the "physical, biological, economic, and social effects of implementing each alternative considered in detail." If it is unable to estimate the effects precisely, it may give a probable range. 43 CFR 1610.4-6. Similarly, Federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions, including the reasonably foreseeable GHG emissions. 88 FR 1196, 1200. As noted in the RMPA, the Council on Environmental Quality has released interim guidance to assist agencies with estimating GHG emissions and climate change effects. 88 FR 1196 (Jan. 9, 2023) (the "Interim Guidance"). In short, under the Interim Guidance, agencies should quantify proposed actions' GHG emissions and place GHG emissions in appropriate context.

Climate change is caused by GHG emitted anywhere around the world and GHG emissions are, overwhelmingly, a product of the demand[3] for coal by downstream users. *See, e.g.* BFO SEIS/RMPA, 3-82 ("Downstream coal combustion comprises more than 97 percent of the emissions in all cases."). Therefore, proposed alternatives will reduce GHG emissions and climate impacts only to the extent they reduce the worldwide demand for coal. The Ninth Circuit has

---

[3] Demand means the quantity consumers are willing and able to purchase. AUTHOR O'SULLIVAN, ECONOMICS: PRINCIPLES IN ACTION 79 (2003).

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

endorsed the need to consider how an alternative changes worldwide demand and production related emissions.

> The direct downstream emissions of the no-action alternative are zero, but—as BOEM recognized—its indirect downstream emissions may be much higher. Not drilling at the proposed site may cause global oil supply to fall, demand to rise, and, as a result, require drilling and oil extraction elsewhere. To capture these indirect downstream emissions, BOEM used a market-simulation model to predict the greenhouse gas emissions for energy sources that would substitute for the oil not produced….

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

Therefore, the SEIS must consider how the alternatives that end mining in the analysis area may cause mining and extraction—and accompanying GHG emissions—elsewhere. BLM cannot simply ignore these downstream emissions, it must account for sources that would substitute for the coal not produced in the analysis area.

The RMPA assumes that there will be no substitution for the loss of coal from the analysis area, which is a clearly unrealistic assumption provided without evidence or discussion. If export volumes and demand remain steady, then a decrease in production in the analysis area necessarily means that more coal will be produced elsewhere. In response to commenters making this obvious point, BLM offers two contradictory responses. First, BLM claims that demand may in fact fall, and so it could not provide an estimate of substitution. BFO SEIS/RMPA, Appx. H-54. However, it also claims that federal policies and coal management are not a driver of coal's predicted future demands. BFO SEIS/RMPA, Appx. H-50. If BLM's policies are not likely to significantly affect the future demand of coal, then any reduction in coal production in the PRB will necessarily be replaced by increased production elsewhere.  To the extent that coal comes from less efficient sources (as it likely will), the overall emissions may even increase, even if there is less than perfect substitution.

Instead of dealing with an uncertain substitution rate by presenting a range of values, BLM implicitly assumes that there will be zero substitution when discussing the qualitative impacts of emissions, and explicitly assumes there will be zero substitution when calculating the Social Cost of GHG emissions. BFO SEIS/RMPA, 3-82. BLM acknowledged that the reduction in emissions from PRB coal "must also be considered in tandem with the potential for combustion of lower quality coal in the absence of PRB coal," BFO SEIS/RMPA, 3-121; *see also* MCFO RMPA, 3-141. Nonetheless, the RMPA never actually does so.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

The RMPA fails to account for the substituted coal emissions because, based on BLM's own assumptions, there is no reasonable way to conclude that emissions will decrease if future mining shuts down for lack of available coal. Yet, that is exactly the conclusion BLM reached. In response to comments, BLM buried its head, responding only that markets are complex and it could not estimate the substitution rate. But to calculate the net emissions, some assumption must be made, so BLM set the substitution rate at zero—something the Ninth Circuit has chastised another Department of Interior bureau for doing. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

**BLM gave short shrift to the economic and social impacts on the social justice communities that would be impacted by the loss of livable wage jobs.**

BLM consistently downplayed the reasonably foreseeable negative impacts of the mines' closures on the surrounding social justice communities. And it did not even consider the jobs lost in the downstream communities that rely on the PRB coal.

Mining plays a crucial role in the economic stability of a rural region where 70% of the census blocks were identified as environmental justice communities. They provide some of the highest-paying private-sector jobs within the region. BFO SEIS/RMPA, Appx. D-3. These positions are not seasonal or transitional jobs, but enduring careers that enable workers to earn wages to support their families as the sole income earner and to support extended family. The economic impacts of coal mines within the planning area extend beyond their employees, permeating throughout the community and significantly contributing to overall economic self-sufficiency. The immense value of coal mining, which is projected to average about two billion dollars per year, is the essential nucleus for a robust economic system. Mined coal is the ultimate source of an estimated $50,000,000 per year of wages paid for direct, indirect, and induced work, fostering financial security and improving the standard of living for thousands of families.

As the RMPA noted, the cessation of mining would precipitate a myriad of health impacts within the local community. BFO SEIS/RMPA, 3-103. The loss of stable, high-paying employment is associated with heightened stress levels and related mental health issues such as anxiety and depression. Economic hardship can also directly affect physical health by decreasing access to healthcare services, nutritious food, and even basic necessities. Unemployment can lead to social isolation and feelings of helplessness, exacerbating mental health concerns. While the RMPA makes passing mention of these social impacts, the environmental justice analysis does not specifically or meaningfully consider how these health and social consequences will disproportionately fall on identified environmental justice communities.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

**BLM should have considered the national security implications of blocking the future coal leases within the analysis area.**

Despite multiple comments that raised national security concerns associated with BLM's failure to designate any lands suitable for mining, BLM still refused to discuss these concerns. BLM has a statutory responsibility to manage public lands for multiple uses, including energy development, while balancing environmental concerns. However, in amending the Resource Management Plan to block future coal leases, the BLM should have explicitly considered the national security implications of this decision, especially in combination with its simultaneous ending of future leasing within the Miles City Field Office.

The MLA requires the Secretary of the Interior to lease public lands for mineral development, including coal. While the MLA certainly allows some discretion, it also emphasizes the importance of promoting the orderly development of domestic mineral resources. This suggests a need to consider the broader consequences of leasing decisions, including their potential impact on national energy security.

As discussed, FLPMA mandates that public lands be managed for multiple use and sustained yield. While FLPMA allows for prioritizing certain uses over others, it also requires that decisions be made in the public interest. Given the potential impact of coal on national security, the BLM should have thoroughly addressed this dimension within its analysis.

By failing to adequately consider the national security implications of its decision, the BLM undermines its statutory obligations under both the MLA and FLPMA. A comprehensive assessment of energy security concerns would not only have aligned with the broader intent of these laws but also potentially led to a more balanced and informed decision regarding future coal leases.

Domestic coal production is of paramount importance to national security, particularly because of its critical role in the production of steel, concrete, sugar, and stable energy. Steel is a major component of national defense, both through the direct construction of military equipment, and indirectly, as an essential component in the construction, automotive, and energy sectors. Coal is also integral to the production of concrete. In the case of concrete production, coal combustion products, particularly fly ash, are often used as a replacement for a portion of the Portland cement used in concrete. The use of fly ash in concrete not only reduces GHG emissions, but it also enhances the strength and durability of the final product. Although BLM mentioned, in passing, that substitutes for fly ash are available, it did not consider the emissions associated with production of those substitutes or their availability. BLM acknowledges that the No Leasing

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

Alternative will also hamper production of non-federal coal, but it did not consider how that reduction would adversely impact national security.

**BLM denies that it is making coal leasing and development decisions, even as it touts that the No Leasing Alternative will end future leasing in the PRB.**

BLM repeatedly argues that it is not making a coal leasing and development decision, because it will review any lease applications received. BFO SEIS/RMPA, H-25. However, BLM selected the No Leasing Alternative specifically because it would result in no new leases being approved.

BLM admits that it would need to amend the RMPA again before a new coal lease could be authorized. If BLM intends to block new coal leases, then it should acknowledge that in its analysis. Instead, BLM argues that since it may change its mind in the future, it is not really making a decision today. *See* BFO SEIS/RMPA, Appx. H-26. Yet, its decision will directly and inevitably lead to the denial of already submitted lease applications.

Over and over, BLM repeats that the RMPA is just a land use-level review, essentially denying that it is making development decisions, even as it acknowledges that the RMPA will cause the termination of pending leases and halt further development. BFO SEIS/RMPA Appx. H-13, H-75, H-84, H-109 to H-111. Comment after comment discusses the impact of eliminating future coal leasing within the analysis area. However, instead of responding to those concerns, BLM denies it is making any decision at all.

**Conclusion**

NTEC requests BLM reconsider the proposed No Leasing Alternative and its incorporation into the RMPA. As require by law, BLM should select another alternative that permits future coal leasing within the Powder River Basin to support domestic production of federal resources.

Respectfully Submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

Ryen L. Godwin

RLG:tjl

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

Attachments:   NTEC's Comment Letter
              List of Commenters and Comments

<u>Exhibit A</u>

Copy of Comment Letter Submitted by NTEC

[Attached]



Submitted via *BLM National NEPA Register Portal* to Docket No. DOI-BLM-WY-P070-2022-0115-RMP-EIS

Mr. Thomas E. Bills
Project Manager
Bureau of Land Management
Buffalo Field Office
1425 Fort Street
Buffalo, WY 82834

**Re:    Comment on the Draft Supplemental Environmental Impact Statement for the Buffalo Field Office Potential Resource Management Plan Amendment**

Mr. Bills:

Navajo Transitional Energy Company, LLC (NTEC) appreciates the opportunity to comment on the Bureau of Land Management's (BLM's) Buffalo Field Office Draft Supplemental Environmental Impact Statement (SEIS) to the Buffalo Field Office Potential Resource Management Plan Amendment (RMP).

NTEC is a single member, limited liability company wholly owned by the Navajo Nation and incorporated under the laws of the Navajo Nation. NTEC was formed to promote the economic and financial interests of the Navajo Nation and its citizens, while remaining dedicated to responsible management of the Nation's natural resources.

The Navajo Nation is a federally recognized sovereign Indian tribe, with territories spanning areas of Arizona, Utah and New Mexico. As one of the largest tribes in the United States, the Navajo Nation has a rich cultural history, underpinned by a deep connection to their lands. Under the Navajo Treaty of 1868, the Navajo Nation lands are set apart as a permanent homeland for the Navajo people, for their exclusive use and occupation without interference, and the Nation reserved unto itself the right to manage its lands. Article XIII, Treaty of Bosque Redondo, 15 Stat. 667 (1868).

NTEC's diversified energy portfolio includes coal mines on the Navajo Nation (Navajo Mine) and in Montana (Spring Creek Mine, Big Horn County) and Wyoming (Antelope Mine, Campbell and Converse Counties; and Cordero Rojo, Campbell County). As owners of the Antelope and Cordero Rojo mines, the Navajo Nation would be directly and adversely impacted by the proposed SEIS.

**NTEC urges the BLM to adopt Alternative B, the No Action alternative, because the other alternatives will cause significant harm without providing meaningful environmental benefits or reducing GHG emissions.**

August 3, 2023
Page 2

***Coal mining is a critical economic pillar of Campbell and Converse Counties.***

The value provided by the Wyoming Powder River Basin mines goes beyond the hundreds of millions of dollars paid to the county, state, and federal government through taxes and royalty fees. Coal mining, which provides high-paying jobs within a region where 70% of the census blocks were identified as environmental justice communities, is the central economic pillar of Wyoming's Powder River Basin. SEIS at 3-92 and Appx. D-3. These positions are not seasonal or transitional jobs, but enduring careers where workers earn enough to support their families. The economic impact of coal mining extends beyond the thousands of mine employees, permeating throughout the community and significantly contributing to overall economic self-sufficiency. As the SEIS notes, coal mining and support activities provide over 15% of all jobs locally. SEIS at Appx. D-2 and D-3. The immense value of coal mining, which (not counting indirect and induced activities) is projected to average about two billion dollars per year, is the essential nucleus for a robust economic system. Mined coal is the ultimate source of an estimated $500,000,000 per year of wages paid for direct, indirect, and induced work, fostering financial security and improving the standard of living for thousands of families.

As the SEIS noted, the cessation of mining would precipitate a myriad of health impacts within the local community. The loss of stable, high-paying employment is associated with heightened stress levels and related mental health issues such as anxiety and depression. Economic hardship can also directly impact physical health by decreasing access to healthcare services, nutritious food, and even basic necessities. Unemployment can lead to social isolation and feelings of helplessness, exacerbating mental health concerns. While the SEIS makes passing mention of these social impacts, the environmental justice analysis does not specifically or meaningfully consider how these health and social consequences will disproportionately fall on identified environmental justice communities.

***Domestic coal production is essential for national security.***

Domestic coal production is of paramount importance to national security, particularly because of its critical role in the production of steel, concrete, sugar, and stable energy. Steel is a major component of national defense, both through the direct construction of military equipment, and indirectly, as an essential component in the construction, automotive and energy sectors. Without domestic coal production, the United States would have to rely on foreign sources for its coal needs, creating a potential vulnerability due to supply chain disruptions, political instability, or price volatility in other regions.

Coal is also integral to the production of concrete. In the case of concrete production, coal combustion products, particularly fly ash, are often used as a replacement for a portion of the Portland cement used in concrete. This substitution not only reduces greenhouse gas emissions, but it also enhances the strength and durability of the final product.

Coal is used in the steel production process as a reducing agent for iron ore—this process, known as coking, yields coke, which is a high-carbon content derivative of coal and an essential ingredient for making steel. Moreover, steel is a vital material in various sectors,

August 3, 2023
Page 3

including defense, infrastructure, and manufacturing, underscoring the strategic imperative of securing domestic coal production to ensure a steady supply of steel for national security requirements.

Beyond its strategic role in concrete and steel production, coal also plays a critical role in electricity generation, a cornerstone of the nation's infrastructure. Coal-powered electricity makes up nearly 20% of total electricity generation. A key source of baseload power, coal-fired power plants can operate continuously and provide a stable and reliable supply of electricity, irrespective of weather conditions or time of day. This continuous power generation capability is essential for national security, as it supports the uninterrupted functioning of critical infrastructure, including military installations, communication networks, and emergency services. Therefore, prematurely phasing out domestic coal production, especially the entire Wyoming Powder River Basin undermines national security and energy resilience.

### *BLM improperly calculates and understates the total emissions for Alternatives A and C.*

As noted in the SEIS, the Council on Environmental Quality has released interim guidance to assist agencies with estimating greenhouse gas (GHG) emissions and climate change effects. 88 FR 1196 (Jan. 9, 2023) (the "Interim Guidance"). In short, under the Interim Guidance, agencies should quantify proposed actions' GHG emissions and place GHG emissions in appropriate context.

Federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions, including the reasonably foreseeable GHG emissions. 88 FR 1196, 1200. And the National Environmental Policy Act requires agencies to consider the worldwide and long-range character of environmental problems, such as climate change. 42 U.S.C. § 4332(2)(F). Climate change is caused by GHG emitted anywhere around the world and GHG emissions from coal combustion are, overwhelmingly, a product of the demand[1] for coal by downstream users. *See, e.g.,* SEIS at 3-88 (finding 6,163 of 6,321 MMT $CO_2$e are from downstream combustion). Therefore, proposed alternatives will reduce GHG emissions and climate impacts only to the extent they reduce the worldwide demand for coal. The Ninth Circuit has endorsed the need to consider how an alternative changes worldwide demand and production related emissions.

> "The direct downstream emissions of the no-action alternative are zero, but—as BOEM recognized—its indirect downstream emissions may be much higher. Not drilling at the proposed site may cause global oil supply to fall, demand to rise, and, as a result, require drilling and oil extraction elsewhere. To capture these indirect downstream emissions, BOEM used a market-simulation model to predict the

---

[1] Demand means the quantity consumers are willing and able to purchase. O'Sullivan; Sheffrin, Economics: Principles in Action 79 (2003).

> greenhouse gas emissions for energy sources that would substitute for the oil not produced….”

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

Following *Bernhardt,* the SEIS must consider how the alternatives that end mining in Wyoming's Powder River Basin may cause mining and extraction—and accompanying GHG emissions—elsewhere. BLM cannot simply ignore these downstream emissions, it must account for sources that would substitute for the coal not produced.

As discussed in *Bernhardt*, many factors influence which power plants operate and, thus, the demand for coal from energy generation units. Those factors include the relative price of coal and its substitution elasticity, generators' nonfuel variable operating costs, startup/shut down costs, emission rates and allowance costs, electricity grid flow constraints, and reliability constraints.[2] The SEIS does not discuss how any of the proposed alternatives will impact any of these factors, so it is not clear how limiting future coal mining in Wyoming's Powder River Basin would reduce *worldwide* coal demand— and worldwide emissions.

Coal production, like GHG emissions, is driven primarily by demand. SEIS at 3-101 ("Since mines already have recoverable reserves on hand, annual production decisions are driven by market demand and mine mouth prices for low-sulfur sub-bituminous coal from Wyoming's Powder River Basin.") (Footnote omitted). The SEIS assumes that there will be no substitution whatsoever of Wyoming's Powder River Basin coal, which is a clearly unrealistic assumption provided without evidence or discussion. The Ninth Circuit explicitly rejected an agency decision to omit foreign emissions from its GHG calculations, even when the exact emitter and quantities are unknown. 982 F.3d at 740. It is enough to know that there will be some increase in foreign emissions to warrant discussion and environmental analyses. *Scientists' Inst. For Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

Based on information provided in the SEIS, it is reasonably foreseeable that Alternative A will result in increased emissions from other sources, and BLM must account for those other emissions in its SEIS. In fact, it is likely that the total GHG emissions for Alternative A approximates GHG emissions of the other alternatives, at least for the analysis period, because all of the downstream sources (which account for 97% of GHG emissions attributed to coal mining) will be able to source coal from elsewhere.

Under both the Interim Guidance and judicial precedent, BLM must consider *all* reasonably foreseeable emissions caused by selecting an alternative. However, the SEIS misrepresents the total emissions of Alternative A by failing to account for the foreseeable increase in emissions from other sources. If production in Wyoming's Powder River Basin

---

[2] U.S. Energy Information Administration, Fuel Competition in Power Generation and Elasticities of Substitution, 1 (June, 2012) ("The elasticity of substitution concept measures how the use of these fuels varies as their relative prices change.") (https://www.eia.gov/analysis/studies/fuelelasticities/pdf/eia-fuelelasticities.pdf) (last accessed Jul. 25, 2023).

August 3, 2023
Page 5

is prohibited after 2040, the downstream sources of GHG emissions will readily find additional coal from other regions. To the extent that coal comes from less efficient sources (as it likely will), the overall emissions may even increase, even if there is less than perfect substitution. In sum, the emissions from coal produced at sites other than Wyoming's Powder River Basin are foreseeable emissions that must be accounted for when evaluating Alternative A. *See* 982 F.3d at 736.

### *BLM improperly calculated the social cost of carbon for the all of the alternatives.*

Agencies should also provide context for GHG emissions and climate effects, which can include the social cost of GHG. 88 FR 1196, 1202. Calculating public health impacts from GHG emissions is inherently uncertain. *See Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) (upholding FERC finding that there was no scientifically-accepted methodology available to correlate specific amounts of GHG emissions to discrete changes in the human environment and FERC's rejection of the Social Cost of Carbon methodology for calculating climate change impacts). Nonetheless, the Interim Guidance provides guidance on how GHG emissions may be used to calculate the social cost of GHG and provide appropriate context for alternatives.

Under the Interim Guidance, agencies should quantify proposed actions' "total net GHG emissions or reductions (both by pollutant and by total CO2-equivalent emissions) relative to baseline." 88 FR 1196, 1201. If the social cost of GHG will be presented, it is calculated from the net GHG emissions. 88 FR 1196, 1202. Net GHG emissions account for the GHG impact of sources of GHG emissions that would be replaced by the proposal. 88 FR 1196, n53. For example, in an August 2022 Environmental Assessment associated with a geothermal lease, BLM determined that it was "reasonably foreseeable" that a geothermal facility would result in a reduction of GHG emissions by displacing fossil-fuel fired power plants. BLM, Environmental Assessment for the August 2022 Competitive Geothermal Lease Sale, 31 (Doc. # DOI-BLM-NV-B000-2022-0001-EA).

Here, the SEIS improperly calculates the social cost of GHG for Alternative A, because it does not use net GHG emissions. Instead, the SEIS calculates the social cost of GHG using each alternative's total emissions (which, as discussed above, were also incorrectly calculated). Net emissions are equal to the difference between the total emissions of a proposed alternative and the total emissions it would displace. 88 FR 1196, n53. As discussed above, the SEIS wrongfully treats total emissions from Alternative A as zero. When calculating the social cost of carbon for Alternative A, BLM must account for the increase in emissions attributed to the substitution of Wyoming's Powder River Basin coal. As discussed above, those emissions at least approach the baseline, No Action alternative (Alternative B).

Similarly, the SEIS fails to properly calculate the social cost of GHG for Alternatives B and C, because it does not subtract the emissions displaced by the use of Wyoming's Powder River Basin coal. Put another way, the SEIS assumes that there will be zero substitution. Once again, that is an erroneous and unsupported assumption. The SEIS properly recognizes that demand is driving production, but then it flips that relationship

August 3, 2023
Page 6

and assumes any reduction in production will create a 100% decrease in demand. In fact, those downstream sources are likely to emit as much GHG whether coal from Wyoming's Powder River Basin is available, and they must be accounted for to accurately calculate net GHG emissions and the social cost of GHG.

If BLM selects Alternative A, no more coal would be produced in Wyoming's Powder River Basin after mid-2041, with the foreseeable consequence that demand for coal would be met by other sources, potentially including producers of dirtier coal. Accordingly, coal demand fulfilled by coal from Wyoming's Powder River Basin displaces coal from other sources. Therefore, each of the alternatives should have approximately the same social cost of GHG.

### *Conclusion*
The SEIS fails to adequately account for environmental justice concerns stemming from the significant harms the co-preferred alternatives would inflict on identified environmental justice communities. In fact, although the SEIS identifies many communities in Campbell and Converse counties as environmental justice communities, it fails to make any meaningful and specific consideration of how job losses from the mine's closures would impact community health. Finally, the SEIS fundamentally misstates both total and incremental GHG emissions, misrepresenting the tradeoffs between the proposed alternatives. BLM should adopt Alternative B, the No Action alternative, because the other alternatives will cause significant harm without providing meaningful environmental benefits or reducing GHG emissions.

Exhibit B

The following commentators raised the issues in this Protest in comment letters due August 7, 2023.

- Board of Commissioners Converse County, Wyoming
- National Mining Association
- State of Wyoming, Office of the Governor
- Wyoming Department of Environmental Quality
- Wyoming Mining Association

# Schwabe

June 17, 2024

**Ryen L. Godwin**
Admitted in Washington, Montana and
Wyoming
D: 206-689-1213
C: 206-643-4253
rgodwin@schwabe.com

SUBMITTED VIA *BLM NATIONAL NEPA REGISTER PORTAL*
TO DOCKET NO. DOI-BLM-MT-C020-2022-0086-RMP-EIS

Ms. Tracy Stone-Manning
Director
Bureau of Land Management
U.S. Department of the Interior
VIA: Online Submission

**Re:   Protest of the Miles City Field Office Proposed Resource Management Plan
Amendment and Supplemental Environmental Impact Statement.**

Ms. Stone-Manning:

Schwabe, Williamson & Wyatt, on behalf of Navajo Transitional Energy Company, LLC (NTEC) submits NTEC's protest of the Bureau of Land Management's (BLM's) Proposed Resource Management Plan Amendment (RMPA) and Supplemental Environmental Impact Statement (SEIS) for the Miles City field office (collectively, the MCFO SEIS/RMPA). The address for NTEC's corporate headquarters is 385 Interlocken Crescent, Suite 400 Broomfield, CO 80021.  NTEC's phone number is (702) 566-2900.

NTEC is a single member, limited liability company wholly owned by the Navajo Nation and incorporated under the laws of the Navajo Nation. NTEC was formed to promote the economic and financial interests of the Navajo Nation and its citizens, while remaining dedicated to responsible management of the Nation's natural resources.

NTEC's diversified energy portfolio includes coal mines on the Navajo Nation (Navajo Mine), in Montana (Spring Creek Mine, Big Horn County), and Wyoming (Antelope Mine, Campbell and Converse Counties; and Cordero Rojo, Campbell County). As owners of the Spring Creek Mine, NTEC will be directly and adversely impacted by the RMPA because it will limit NTEC's ability to seek coal leases for federal coal in areas adjacent to Spring Creek Mine. The impacts of the RMPA on Spring Creek Mine are repeatedly referenced in the SEIS and RMPA.

NTEC provided detailed comments during the comment period for the draft SEIS. Unfortunately, after reviewing the RMPA, it is clear that BLM dismissed all of them. NTEC is protesting the RMPA, including the adequacy of the SEIS and BLM's selection of the No Leasing Alternative.  Among other parts of the RMPA and as discussed in more detail below, NTEC is protesting the selection of the No Leasing Alternative (MCFO SEIS/RMPA, 2-17), the reasonably

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

foreseeable development under each of the alternatives (MCFO SEIS/RMPA, Section 2.2.1), the rationale for that selection (MCFO SEIS/RMPA, 2-17), the calculation of downstream emissions (MCFO SEIS/RMPA, Sections 3.3 and 3.4), and the minimization of the socio-economic impacts of the proposed alternative (MCFO SEIS/RMPA Section 3.5 and 3.6).

The specific grounds for the protests are provided below. All of the issues were raised during the comment process before BLM issued the RMPA, and this protest relies upon the comments submitted during the public comment period. A copy of NTEC's comment letter is attached as <u>Exhibit A</u>. A list of comments relied upon below and the name of the commentator is enclosed as <u>Exhibit B</u>.

**BLM's Resource Management Plan Amendment terminates federal coal leasing including pending lease applications, despite clear Congressional direction to the contrary in the Mineral Leasing Act.**

Under the No Leasing Alternative, "pending federal lease applications would not be authorized. None of the future anticipated needs would be satisfied through federal authorizations." MCFO SEIS/RMPA, 2-15. As the BLM is well aware, the Powder River Basin (PRB) provides 85% of the federal coal in the United States, so the decision not to designate any lands outside of the existing leases as suitable for coal mining will effectively eliminating future mining of federally owned coal. That decision is directly contrary to the Mineral Leasing Act of 1920 (MLA) and the Mining and Minerals Policy Act of 1970 (MMPA), and the body of federal regulation implementing those statutes. Congress has specifically directed that coal leasing shall be available in those areas suitable for such activity. The Department of the Interior cannot render meaningless a body of federal legislation in a single executive action such as a resource management plan amendment.

The purpose of the MLA is "to promote the mining of coal" and other minerals on the public domain. MLA, 41 Stat. 437 (1920) (preamble). The MLA clearly states: "Deposits of coal . . . shall be subject to disposition in the form and manner provided by this Chapter to the citizens of the United States[.]" 30 USC § 181. Similarly, the MMPA, directs the Secretary of the Interior to promote the development of domestic mineral resources. 30 USC § 21a. This mandate further requires the Secretary of the Interior to implement Congressional policy through programs providing for the "orderly and economic development of" coal resources. *Id.*

The MLA, as amended by the Federal Coal Leasing Amendments Act (FCLAA), provides specific criteria for issuing coal leases. Therein, Congress directed the Secretary of the Interior to adopt rules for coal leases according to a prescribed process for managing federal lands. 30 USC § 189; 30 USC § 201. Congress directed the Secretary of the Interior to develop a "comprehensive

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

land-use plan" for coal development and prohibited the Secretary from implementing policy or regulations inconsistent with that plan. 30 USC § 201. There is nothing in the MLA, FCLAA, or MMPA permitting a total ban on coal development. In fact, such a total ban entirely circumvents Congress' well expressed intent, and is contrary to well established law.

While the Secretary of the Interior certainly has discretion to implement the MLA, FCLAA, and MMPA in a manner consistent with NEPA, the statutes' clear mandate to make coal available for leasing to support domestic production leaves no discretion to ban coal leasing all together. The Secretary in this regard is amending federal statutes, with a single executive action, and without regard for the decision of elected officials in Congress. It is not for the executive branch to make sweeping energy and mineral policy determinations, as BLM does with the RMPA, where Congress has already made the difficult policy decision to promote and develop the Nation's coal through federal leasing.

The BLM's reason to ban coal leasing here is similar to the reasons that were considered and rejected by the District of Louisiana in *State v. Biden*. *State v. Biden*, No. 2:21-cv-00778, 33-34 (W.D. Louisiana filed June 15, 2021). In *State v. Biden*, the Biden Administration issued numerous executive orders, similar to those orders cited in the RMPA, to explore options to reduce fossil fuel development. To implement these Executive Orders the Secretary of the Interior "paused" all federal oil and gas development on the Outer Continental Shelf. States that rely upon oil and gas royalties challenged the pause as a violation of the MLA and Outer Continental Shelf Leasing Act. The Court held:

> By stopping the process, the agencies are in effect amending two Congressional statutes. Neither the OCSLA nor the MLA give the Government Defendants' agencies the authority to [pause] lease sales. Those statues require eligible oil and gas leases to continue to be sold in accordance with the statutes. The Court finds that the stopping of leasing of eligible lands and waters is contrary to law.

*State v. Biden*, No. 2:21-cv-00778, pg. 33-34 (W.D. Louisiana filed Aug. 18, 2022).

NEPA requires federal agencies to consider the environmental impacts of their actions, but it does not authorize an agency to disregard laws passed by Congress just because it disagrees with the outcome. Whether or not there is a significant impact, BLM is still required to follow all of the pertinent laws and regulations when making its decision. The BLM's decision to ban coal leasing in the Powder River Basin is contrary to law, in particular the MLA, FCLAA, and MMPA, among the other federal statutes promoting domestic coal development.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

**BLM's proposed decision under the RMPA violates FLPMA's multiple use mandate.**

FLPMA requires the Secretary to manage public lands for multiple uses, including mineral development, and to develop comprehensive land use plans incorporating these various uses. 43 U.S.C. §§ 1701(a)(7), 1712(c).  FLPMA directs the Secretary to "use and observe the principles of multiple use and sustained yield" in developing land use plans. 43 U.S.C. § 1712(c)(1).  BLM's ban on coal leasing fails to provide for "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment[.]" 43 CFR 1601.0-5(i).  A complete ban fails to balance multiple uses by simply elevating a single use or resource value over all other uses.  It is antithetical to principles of "multiple use and sustained yield" to impose a complete ban on the most significant revenue generating use of federal lands within the Powder River Basin like further coal leasing.  43 U.S.C. § 1712(c)(1).

BLM's application of the multiple use criteria in coal screening not only violates FLPMA's multiple use mandate, it is also completely arbitrary.  The RMPA states:

> BLM applied a climate change criterion for air resources under Screen 3 (multiple-use) that considers climate change as a resource value unique or of local, regional, or national importance to develop a range of alternatives that meet the purpose and need. To that end, to eliminate federal lands based on a climate change criterion for air resources, the BLM anticipates by limiting future opportunities for federal coal leasing and development there may be a reduction in GHG emissions from combustion of new federal coal, which would thus reduce climate change effects.

MCFO SEIS/RMPA, 2-1.

First, climate change is not a resource value contemplated by FLPMA. FLPMA's multiple use standard refers to resource values specific to the land like open space, timber, minerals, water quality, wildlife, and air quality, not global climate change.  *See* 43 USC § 1702, (c).  BLM's attempt to shoehorn climate change into air resources contorts the plain language of the statute.

Second, BLM's conclusion that eliminating coal mining in the PRB will protect the climate change resource is arbitrary. The Multiple Use screen provides that "multiple use decisions shall be made which may eliminate additional coal deposits from further consideration for leasing *to protect* other resource values and land uses[.]"  43 CFR 3420.1-4(e)(3) [emphasis added].  The elimination of coal leasing will not "protect other resource values" such as air quality and public health impacts from greenhouse gas (GHG) emissions and/or climate change.  The RMPA states:

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

> The emission sources may burn fuels produced outside the planning
> area as well as nonfederal minerals sourced from the planning area.
> Therefore, the emissions presented and the resulting impacts on air
> quality and public health are not necessarily due only to planning
> area fossil fuels.

MCFO SEIS/RMPA, 3-45.  This statement means that coal fired generation is not solely dependent on PRB coal so GHG emissions and corresponding climate change will continue until GHG emissions cease globally, rather than simply terminating coal leasing in the PRB.

It is patently arbitrary for BLM to choose a means to an end, like a ban on coal leasing to protect other resource values, where BLM admits that such a means has no causal relationship to the end.   There is not a single statement in either the MCFO RMPA or the BFO RMPA that links the reduction in coal from the planning area to the actual protection of some other resource value because power plants will find another source of fuel.

The Multiple Use screen is intended to resolve actual conflicts between uses like urban development on rangelands, mining through historic or cultural resources, or logging in critical habitat for a listed species.  The Multiple Use screen is not intended to act as a catch all for any and all environmental impacts occurring globally.  If BLM's position was correct, then BLM could prohibit logging on public lands in Montana to protect pollution from mills in China or prohibit ATVs on public lands in Wyoming to prevent pollution from manufacturing plants in Ohio. BLM's action does not protect the climate change resource value, even if climate change could arguably be contemplated as a resource value in FLPMA.

Moreover, coal mine permits already require the permittee to protect other environmental resources such as air quality, land quality, water quality, and wildlife.  A mine operator is required to hold a Clean Air Act permit, a Clean Water Act water quality permit, a Surface Mining Control and Reclamation Act reclamation plan, a U.S. Army Corps of Engineers dredge and fill permit, and applicable wildlife protection and mitigation to prevent environmental impacts.  In other words, there are adequate protections for other resource values so a total ban is entirely arbitrary.

BLM's attempt to fit a square peg into a round hole by using climate change as a resource value in the multiple use screen is a consequence of BLM's lack of statutory authority to provide a comprehensive solution to a complex and global phenomenon.[1]  The executive branch acting

---

[1] BLM's RMPA asserts that the Order in *Western Organizations of Resource Councils v. U.S. BLM* states "coal screening can, and must, take into account climate change."  First, to the extent the Order makes this assertion it is dicta as it applies to FLPMA.  The *WORC* case was about NEPA, not FLPMA so any statement of the law regarding FLPMA's coal screening was not properly before the court.  Second, the Court's discussion is simply stating that

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

through the Secretary's limited FLPMA authority to conduct land use planning for coal development is simply not suited to unwind a century of Congressional policy to develop coal for energy production in the United States.

**BLM violated FLPMA's public participation process when preparing the RMPA.**

An important principle of FLPMA is public participation. FLPMA requires "procedures, including public hearings where appropriate, to give . . . the public, adequate notice and opportunity to comment upon and participate in formulation of plans[.]" 43 USC § 1712(f). Providing adequate notice and opportunity to comment means providing a draft of the resource management plan and an environmental impact statement analyzing certain plan alternatives. 43 CFR 1610.2(f).

BLM failed to comply with its public notice and participation requirements because it never released a copy of the Resource Management Plan Amendment for public comment. It released a draft Supplemental Environmental Impact Statement in May of 2023, but the contents of the SEIS did not identify the proposed RMPA or analyze the coal screening criteria of the proposed RMPA. At best, the SEIS identified potential alternatives, but it did not even identify a single preferred alternative. Instead, BLM decided to identify two potential alternatives depriving the public of the opportunity to comment on the actual plan BLM intended to implement and the FLPMA land use planning criteria intended to support that decision.

**BLM failed to provide a reasoned explanation for its decision to select the No Leasing Alternative.**

BLM must evaluate the impacts of each of the alternatives, and provide a reasoned explanation for its decision. However, the RMPA provided no explanation for why BLM chose the No Leasing Alternative, beyond that BLM "determined that additional leasing of federal coal is not necessary based on the current analysis in the Final SEIS." MCFO SEIS/RMPA, 2-17. In the section titled "Rationale for Identifying a Proposed Plan Amendment" the closest thing that BLM provides to an explanation, is no explanation at all: "operating mines within the planning area have existing leases with sufficient coal reserves to maintain existing mine production levels until 2035 for Spring Creek Mine and 2060 for Rosebud Mine." MCFO SEIS/RMPA, 2-17. At best, this could be read as an implicit statement by BLM that federal coal mining should stop in in 2035 and 2060 respectively, although it is not clear why BLM believes that Congress put an expiration date on the MLA.

---

NEPA requires an assessment of climate change impacts. It does not, however, state that FLPMA allows BLM to ban coal leasing all together. In fact, as held by the Court in *State v. Biden*, the MLA prohibits a ban on coal leasing.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

Even though the court required BLM to evaluate the environmental impacts of those alternatives, BLM must still give a reasoned explanation for choosing the No Leasing Alternative. BLM has provided a data dump, summarizing what it claims are the foreseeable impacts of each alternative. However, BLM never takes the requisite next step of providing meaningful discussion about why it ultimately chose the No Leasing Alternative. Such discussion is required under FLPMA and NEPA.

**BLM misstated the relative impacts of the different alternatives.**

Central to BLM's justification of its decision to block future leasing in the analysis area, is its conclusion that that air quality in the downstream communities is significantly better under the No Leasing Alternative. Since the Powder River Basin produces some of the lowest sulfur coal in the world, BLM can only justify that conclusion if less coal is used in the downstream communities. Not only is that an absurd conclusion, it is a conclusion that contradicts BLM's own assumptions.

BLM is required to estimate the "physical, biological, economic, and social effects of implementing each alternative considered in detail." If it is unable to estimate the effects precisely, it may give a probable range. 43 CFR 1610.4-6. Similarly, Federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions, including the reasonably foreseeable GHG emissions. 88 FR 1196, 1200. As noted in the RMPA, the Council on Environmental Quality has released interim guidance to assist agencies with estimating GHG emissions and climate change effects. 88 FR 1196 (Jan. 9, 2023) (the "Interim Guidance"). In short, under the Interim Guidance, agencies should quantify proposed actions' GHG emissions and place GHG emissions in appropriate context.

Climate change is caused by GHG emitted anywhere around the world and GHG emissions are, overwhelmingly, a product of the demand[2] for coal by downstream users. *See, e.g.* MCFO SEIS/RMPA, 3-100 ("Downstream coal combustion comprises more than 97 percent of the emissions in all cases."). Therefore, proposed alternatives will reduce GHG emissions and climate impacts only to the extent they reduce the worldwide demand for coal. The Ninth Circuit has endorsed the need to consider how an alternative changes worldwide demand and production related emissions.

The direct downstream emissions of the no-action alternative are zero, but—as BOEM recognized—its indirect downstream emissions may be much higher. Not drilling at the proposed site may cause global oil supply

---

[2] Demand means the quantity consumers are willing and able to purchase. Author O'Sullivan, Economics: Principles in Action 79 (2003).

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

to fall, demand to rise, and, as a result, require drilling and oil extraction elsewhere. To capture these indirect downstream emissions, BOEM used a market-simulation model to predict the greenhouse gas emissions for energy sources that would substitute for the oil not produced….

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

Therefore, the RMPA must consider how the alternatives that end mining at Spring Creek Mine may cause mining and extraction—and accompanying GHG emissions—elsewhere. BLM cannot simply ignore these downstream emissions, it must account for sources that would substitute for the coal not produced in the analysis area.

Half of Montana coal, and 40% of Spring Creek Mine Coal are exported internationally. BLM assumed for purposes of the reasonably foreseeable development analysis that demand and export volumes would remain steady. MCFO SEIS/RMPA, 3-116. As BLM noted, production is driven by demand, and the entire United States contributes only 4.9% of the global coal trade.

The RMPA assumes that there will be no substitution of the Spring Creek Mine's coal, which is a clearly unrealistic assumption provided without evidence or discussion. If export volumes and demand remain steady, then a decrease in production at Spring Creek Mine necessarily means that more coal will be produced elsewhere, substituting for the lost Spring Creek Mine coal. In response to commenters making this obvious point, BLM countered that demand may in fact decrease, but it has no way to know how much substitution would occur. However, BLM never updated its assumption that international demand for coal would remain flat, even as it contradicted itself in the response to comments—likely because their own evidence contradicts that position. To the extent that coal comes from less efficient sources (as it likely will), the overall emissions may even increase, even if there is less than perfect substitution.

Instead of dealing with an uncertain substitution rate by presenting a range of values, BLM implicitly assumes that there will be zero substitution when discussing the qualitative impacts of emissions, and explicitly assumes there will be zero substitution when calculating the Social Cost of GHG emissions. MCFO SEIS/RMPA, 3-86. BLM acknowledged that the reduction in emissions from PRB coal "must also be considered in tandem with the potential for combustion of lower quality coal in the absence of PRB coal," MCFO SEIS/RMPA, 3-141, but the RMPA never actually does so.

The RMPA fails to account for the substituted coal emissions because, based on BLM's own assumptions, there is no reasonable way to conclude that emissions will decrease if Spring Creek Mine shuts down for lack of available coal. Yet, that is exactly the conclusion BLM reached. In response to comments, BLM buried its head, responding only that markets are complex and it

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

could not estimate the substitution rate. But BLM must make some estimate to calculate the net emissions, so it set the substitution rate at zero—something the Ninth Circuit has chastised another Department of Interior bureau for doing. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

**BLM gave short shrift to the economic and social impacts on the social justice communities that would be impacted by the loss of livable wage jobs.**

BLM consistently downplayed the reasonably foreseeable negative impacts of the Spring Creek Mine's closure on the surrounding social justice communities. And it did not adequately consider the jobs lost in the downstream communities that rely on the PRB coal.

The Spring Creek Mine plays a crucial role in the economic stability of a rural region that is home to two Native American reservations, by providing some of the highest-paying private-sector jobs within the region. MCFO SEIS/RMPA, Appx. D-3. These positions are not seasonal or transitional jobs, but enduring careers that enable workers to earn wages to support their families as the sole income earner and to support extended family. Spring Creek Mine's economic impacts extend beyond the individual employees, permeating throughout the community and significantly contributing to overall economic self-sufficiency. As the RMPA notes, coal mining and support activities provide over 15% of all jobs in Big Horn County. MCFO SEIS/RMPA at 3-107. The immense value of coal mining, which is projected to average $118,000,000 per year from 2023-2035 (without accounting for indirect and induced economic impacts) is the essential nucleus for a robust economic system. Mining coal provides an estimated $50,000,000 a year in direct, indirect, and induced wages, fostering financial security and improving the standard of living for hundreds of families.

The cessation of operations at the Spring Creek Mine would precipitate a myriad of health impacts within the local community. These impacts would be particularly acute in Big Horn County because, despite mining's high pay and significant proportion of the jobs in the county, Big Horn County still has the lowest per capita GDP in Montana. MCFO SEIS/RMPA, Appx. D-2. The loss of stable, high-paying employment is associated with heightened stress levels and related mental health issues, such as anxiety and depression. Economic hardship can also directly affect physical health by decreasing access to healthcare services, nutritious food, and even basic necessities. Unemployment can lead to social isolation and feelings of helplessness, exacerbating mental health concerns. While the RMPA makes passing mention of these social impacts, the environmental justice analysis does not specifically or meaningfully consider how these health and social consequences will disproportinately fall on a predominately rural population and indigenous communities.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

**BLM should have considered the national security implications of blocking the future coal leases within the analysis area.**

Despite multiple comments that raised national security concerns associated with BLM's failure to designate any lands suitable for mining, BLM still refused to discuss these concerns. BLM has a statutory responsibility to manage public lands for multiple uses, including energy development, while balancing environmental concerns. However, in amending the Resource Management Plan to block future coal leases, the BLM should have explicitly considered the national security implications of this decision, especially in combination with its simultaneous ending of future leasing within the Buffalo Field Office.

The MLA requires the Secretary of the Interior to lease public lands for mineral development, including coal. While the MLA certainly allows some discretion, it also emphasizes the importance of promoting the orderly development of domestic mineral resources. This suggests a need to consider the broader consequences of leasing decisions, including their potential impact on national energy security.

As discussed, FLPMA mandates that public lands be managed for multiple use and sustained yield. While FLPMA allows for prioritizing certain uses over others, it also requires that decisions be made in the public interest. Given the potential impact of coal on national security, the BLM should have thoroughly addressed this dimension within its analysis.

By failing to adequately consider the national security implications of its decision, the BLM undermines its statutory obligations under both the MLA and FLPMA. A comprehensive assessment of energy security concerns would not only have aligned with the broader intent of these laws but also potentially led to a more balanced and informed decision regarding future coal leases.

Domestic coal production is of paramount importance to national security, particularly because of its critical role in the production of steel, concrete, sugar, and stable energy. Steel is a major component of national defense, both through the direct construction of military equipment, and indirectly, as an essential component in the construction, automotive, and energy sectors. Coal is also integral to the production of concrete. In the case of concrete production, coal combustion products, particularly fly ash, are often used as a replacement for a portion of the Portland cement used in concrete. The use of fly ash in concrete not only reduces GHG emissions, but it also enhances the strength and durability of the final product. Although BLM mentioned, in passing, that substitutes for fly ash are available, it did not consider the emissions associated with production of those substitutes or their availability. BLM acknowledges that the No Leasing

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

Alternative will also hamper production of non-federal coal, but it did not consider how that reduction would adversely impact national security.

**BLM denies that it is making coal leasing and development decisions, even as it touts that the No Leasing Alternative will end future leasing in the PRB.**

BLM repeatedly argues that it is not making a coal leasing and development decision, because there will be a separate review for pending and subsequent lease applications that are compliant with the land use plan decision. MCFO SEIS/RMPA 1-12 (and repeated nine times in responses to comments). However, BLM selected the No Leasing Alternative specifically because it would result in no new leases being approved.

BLM admits that it would need to again amend the RMP before a new coal lease could be authorized. And it claims that at the end of the analysis period (2038) an RMP revision would reevaluate the land use allocations. However, as BLM notes, the Spring Creek Mine will have exhausted its coal reserves by 2035. That means BLM is proposing to start the next amendment process three years after the Spring Creek Mine has shut down. Moreover, it takes over 10 years to procure a coal lease and mining permit so planning is necessary well in advance of the 2035 closure date.  BLM's re-evaluation of its ban on coal leasing in 2038 will be at least 14 years too late for Spring Creek Mine.

The Spring Creek Mine is the only mine in the analysis area with a plan to continue operating indefinitely. If it is not BLM's intent to block new coal leases, then its decision to force Spring Creek Mine to shut down three years before BLM will begin the process of identifying areas suitable for leasing is irrational, arbitrary, and capricious. On the other hand, if it is BLM's intent to block new coal leases, then it should acknowledge that in its analysis. Instead, BLM argues that since it may change its mind in the future, it is not really making a decision today. Yet, its decision will directly and inevitably lead to the denial of Spring Creek's lease application that has been pending since 2012.

Over and over, BLM repeats that it is not making coal leasing and development decisions, even as it acknowledges that the RMPA will cause the termination of pending leases and halt further development. Comment after comment discusses the impact of eliminating future coal leasing within the analysis area. However, instead of responding to those concerns, BLM denies it is making any decision at all. But, the RMPA is nothing less than a total ban on coal development in the PRB.

Bureau of Land Management
U.S. Department of the Interior
June 17, 2024

**BLM's analysis in the SEIS and RMPA contain several technical inaccuracies.**

BLM's analysis contains factual inaccuracies regarding the Spring Creek Mine that effect the suitability screen analysis. The factual inaccuracies are provided in <u>Exhibit C</u>.

**Conclusion**

NTEC requests BLM reconsider the proposed No Leasing Alternative and its incorporation into the RMPA. As required by law, BLM should select another alternative that permits future coal leasing within the Powder River Basin to support domestic production of federal resources.

Respectfully Submitted,

SCHWABE, WILLIAMSON & WYATT, P.C.

Ryen L. Godwin

RLG:tjl

Attachments:    NTEC's Comment Letter
List of Commenters and Comments
Technically deficiencies in BLM's analysis of Spring Creek Mine.

<u>Exhibit A</u>

Copy of Comment Letter Submitted by NTEC

[Attached]



Submitted via *BLM National NEPA Register Portal* to Docket No. BLM_HQ_FRN_MO# 4500169335

Ms. Irma Nansel
Project Manager
Bureau of Land Management
U.S. Department of the Interior
111 Garryowen Road
Miles City, Montana 59301

**Re: Comment on the Draft Supplemental Environmental Impact Statement for the Miles City Potential Resource Management Plan Amendment**

Ms. Nansel:

Navajo Transitional Energy Company, LLC (NTEC) appreciates the opportunity to comment on the Bureau of Land Management's (BLM's) Miles City Draft Supplemental Environmental Impact Statement (SEIS) to the Miles City Field Office Potential Resource Management Plan Amendment (RMP).

NTEC is a single member, limited liability company wholly owned by the Navajo Nation and incorporated under the laws of the Navajo Nation. NTEC was formed to promote the economic and financial interests of the Navajo Nation and its citizens, while remaining dedicated to responsible management of the Nation's natural resources.

The Navajo Nation is a federally recognized sovereign Indian tribe, with territories spanning areas of Arizona, Utah, and New Mexico. As one of the largest tribes in the United States, the Navajo Nation has a rich cultural history, underpinned by a deep connection to their lands. Under the Navajo Treaty of 1868, the Navajo Nation lands are set apart as a permanent homeland for the Navajo people, for their exclusive use and occupation without interference, and the Nation reserved unto itself the right to manage its lands. Article XIII, Treaty of Bosque Redondo, 15 Stat. 667 (1868).

NTEC's diversified energy portfolio includes coal mines on the Navajo Nation (Navajo Mine) and in Montana (Spring Creek Mine, Big Horn County) and Wyoming (Antelope Mine, Campbell and Converse Counties; and Cordero Rojo, Campbell County). As owners of the Spring Creek Mine, the Navajo Nation would be directly and adversely impacted by the proposed SEIS to the RMP.

**NTEC urges the BLM to adopt Alternative A, the No Action alternative, because the other alternatives will cause significant harm without providing meaningful environmental benefits or reducing GHG emissions.**

August 3, 2023
Page 2

**Spring Creek Mine is a critical economic pillar of the Big Horn region.**

The Spring Creek Mine plays a crucial role in the economic stability of a rural region that is home to two Native American reservations, by providing some of the highest-paying private-sector jobs within the region. SEIS at Appx. D-3. These positions are not seasonal or transitional jobs, but enduring careers that enable workers to earn wages to support their families as the sole income earner and to support extended family. Spring Creek Mine's economic impacts extend beyond the individual employees, permeating throughout the community and significantly contributing to overall economic self-sufficiency. As the SEIS notes, coal mining and support activities provide over 15% of all jobs in Big Horn County. SEIS at 3-107. The immense value of coal mining, which is projected to average $118,000,000 per year from 2023-2035 (without accounting for indirect and induced economic impacts) is the essential nucleus for a robust economic system. Mining coal provides an estimated $50,000,000 a year in direct, indirect, and induced wages, fostering financial security and improving the standard of living for hundreds of families.

The value provided by Spring Creek Mine goes beyond the millions of dollars paid to the county, state, and federal government through taxes and royalty fees. Central to Spring Creek Mine's contribution to the community are the direct and indirect employment opportunities it provides to support mining operations. By providing employment opportunities in an area where such high paying jobs are scarce, the mine enables local residents, and many tribal members, to remain anchored to their lands and family.

As the SEIS noted, the cessation of operations at the Spring Creek Mine would precipitate a myriad of health impacts within the local community. These impacts would be particularly acute in Big Horn County because, despite mining's high pay and significant proportion of the jobs in the county, Big Horn County still has the lowest per capita GDP in Montana. SEIS at Appx. D-2. The loss of stable, high-paying employment is associated with heightened stress levels and related mental health issues, such as depression. Economic hardship can also directly impact physical health. While the SEIS makes passing mention of these social impacts, the environmental justice analysis does not specifically or meaningfully consider how these health and social consequences will disproportionately fall on a predominately rural population and indigenous communities.

Abstract descriptions of generalized harms fail to capture the very real impacts closing Spring Creek Mine would have. For example, one Spring Creek Mine employee, who is a member of the Crow Nation, is the primary breadwinner for her son and mother while also providing supplemental income to her nieces and nephews. She has lived her whole life in Montana and, by her own account, if the local mines shut down, she would have to travel out-of-state for work, forcing her to either leave her son or raise him away from his family and the Crow culture. Under the co-preferred Alternative D, this employee would be in her mid-forties when Spring Creek Mine is forced to shut down, taking her livelihood with it.

August 3, 2023
Page 3

**Domestic coal production is essential for national security.**

Domestic coal production is of paramount importance to national security, particularly because of its critical role in the production of steel, concrete, sugar, and stable energy. Steel is a major component of national defense, both through the direct construction of military equipment, and indirectly, as an essential component in the construction, automotive, and energy sectors. Without domestic coal production, the United States would have to rely on foreign sources for its coal needs, creating a potential vulnerability due to supply chain disruptions, political instability, or price volatility in other regions.

Coal is also integral to the production of concrete. In the case of concrete production, coal combustion products, particularly fly ash, are often used as a replacement for a portion of the Portland cement used in concrete. This substitution not only reduces greenhouse gas emissions, but it also enhances the strength and durability of the final product.

Coal is used in the steel production process as a reducing agent for iron ore. This process, known as coking, yields coke, which is a high-carbon content derivative of coal and an essential ingredient for making steel. Of course, steel is a vital material in various sectors, including defense, infrastructure, and manufacturing, underscoring the strategic imperative of securing domestic coal production to ensure a steady supply of steel for national security requirements.

Beyond its strategic role in concrete and steel production, coal also plays a critical role in electricity generation, a cornerstone of the nation's infrastructure. Coal-powered electricity makes up nearly 20% of total electricity generation. A key source of baseload power, coal-fired power plants can operate continuously and provide a stable and reliable supply of electricity, irrespective of weather conditions or time of day. This continuous power generation capability is essential for national security, as it supports the uninterrupted functioning of critical infrastructure, including military installations, communication networks, and emergency services. Therefore, prematurely phasing out domestic coal production undermines national security and energy resilience.

**Halting development more than two miles from existing leases is capricious and may lead to uneconomic and inefficient development of coal resources.**

Alternative B, which proposes to limit leases to within two miles of Spring Creek Mine's existing leases, may disrupt efficient coal recovery sequences, diminishing efficient coal recovery without actually reducing the total amount of coal recovered or producing corresponding benefits. In effect, it forces development to happen inefficiently, and could even result in more environmental impacts. This is because, as Spring Creek Mine develops to the south, there is more topographic variety and overburden, so it is more efficient to recover coal in a linear fashion. However, the two-mile limit would force Spring Creek Mine to develop outward, regardless of the prevailing terrain.

Moreover, most of the land adjacent to and outside the two-mile limit is privately owned, so limiting the expansion will not actually make more federal land available for other

August 3, 2023
Page 4

activities. Nor will it decrease total emissions. In fact, the SEIS predicts the same emissions for alternatives A and B, so it is not clear what benefits are created by the two-mile limit. It does not enhance environmental protections, improve safety, or provide any other tangible value. All it does is serve as an unnecessary impediment to economic development without offering any offsetting advantages.

Moreover, Alternative B does not account for the Decker Mine permit area when determining the two-mile limit. NTEC owns much of the surface estate around the Decker Mine, and it is adjacent to the eastern edge of Spring Creek Mine, so NTEC may wish to develop in that area in the future. Given the development already associated with the Decker Mine and the private ownership of the surface estate, those locations should not be excluded from future development. In sum, BLM offers no discussion as to why it now prefers Alternative B over Alternative A, which it had previously selected. NTEC urges BLM to select Alternative A.

Finally, Alternative C eliminates 73 million tons of coal by eliminating parts of leases that have been pending since 2012. BLM should not use a resource management plan amendment to deny a decade-old lease application. Resource management plans are intended to prospectively guide future planning, not retroactively decide existing applications. Moreover, this alternative inappropriately eliminates the middle third of Spring Creek's pending lease for LBA II. Elimination of that middle third will significantly reduce the efficiency of developing the rest of LBA II, yet eliminating that specific area provides no particular environmental benefits. Eliminating any area covered by a pending lease is unjust; however, Alternative C is particularly capricious.

**BLM improperly calculates and overstates the total emissions for Alternatives A and B.**

Federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions, including the reasonably foreseeable greenhouse gas (GHG) emissions. 88 FR 1196, 1200. GHG emissions include the reasonably foreseeable downstream emissions. *Id*. The SEIS estimates the total emissions of Alternatives A and B by assuming all coal production is combusted in domestic energy generation units (EGUs). However, Spring Creek coal is sold into the international coal market, where it may be used to coke steel or as an energy source in foreign power plants. As noted in the SEIS, half of the coal produced at Spring Creek Mine is used for industrial processes or shipped internationally. That proportion may rise to nearly 100% by 2035, when all of the domestic EGUs that purchase its coal will have retired or changed fuel source. SEIS at Appx. B-8. Therefore, BLM's estimate of total foreseeable emissions, which assumes all Spring Creek coal will be combusted in domestic EGUs, is in error.

Second, coal production is driven primarily by "the market demand for coal in the US electric generation fuel energy mix." SEIS at 3-115. As demand increases, production increases. BLM foresees a decline in demand for coal, so it should forecast a further decline coal production. SEIS at 3-109; *see also* SEIS at 3-134 ("[N]ational and state coal market trends indicate a reduced demand for coal production."). However, when

August 3, 2023
Page 5

calculating total emissions, the SEIS does not project a decline in production. Inexplicably, in the face of the SEIS forecast that demand and production in the United States and Montana will decline, BLM assumes, for purposes of calculating GHG emissions, that not only will production at Spring Creek Mine remain largely consistent, it will actually *increase* in 2037 and then remain flat until 2088. Put simply, this is not a reasonably foreseeable effect of Alternatives A and B, and it arbitrarily and unreasonably overstates the foreseeable total emissions of continuing to operate the Spring Creek Mine.

**BLM improperly calculates and understates the total emissions for Alternatives C and D.**

As noted in the SEIS, the Council on Environmental Quality has released interim guidance to assist agencies with estimating GHG emissions and climate change effects. 88 FR 1196 (Jan. 9, 2023) (the "Interim Guidance"). In short, under the Interim Guidance, agencies should quantify proposed actions' GHG emissions and place GHG emissions in appropriate context.

The National Environmental Policy Act requires agencies to consider the worldwide and long-range character of environmental problems, such as climate change. 42 U.S.C. § 4332(2)(F). Climate change is caused by GHG emitted anywhere around the world and GHG emissions are, overwhelmingly, a product of the demand[1] for coal by downstream users. *See, e.g.* SEIS at 3-101 ("Downstream coal combustion comprises more than 97 percent of the emissions in all cases."). Therefore, proposed alternatives will reduce GHG emissions and climate impacts only to the extent they reduce the worldwide demand for coal. The Ninth Circuit has endorsed the need to consider how an alternative changes worldwide demand and production related emissions.

> "The direct downstream emissions of the no-action alternative are zero, but—as BOEM recognized—its indirect downstream emissions may be much higher. Not drilling at the proposed site may cause global oil supply to fall, demand to rise, and, as a result, require drilling and oil extraction elsewhere. To capture these indirect downstream emissions, BOEM used a market-simulation model to predict the greenhouse gas emissions for energy sources that would substitute for the oil not produced…."

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 736 (9th Cir. 2020).

Therefore, the SEIS must consider how the alternatives that end mining at Spring Creek Mine may cause mining and extraction—and accompanying GHG emissions—elsewhere.

---

[1] Demand means the quantity consumers are willing and able to purchase. AUTHOR O'SULLIVAN, ECONOMICS: PRINCIPLES IN ACTION 79 (2003).

August 3, 2023
Page 6

BLM cannot simply ignore these downstream emissions, it must account for sources that would substitute for the coal not produced.

As discussed in *Bernhardt*, many factors influence which power plants operate and, thus, the demand for coal from EGUs. Those factors include the relative price of coal and its substitution elasticity, generators' nonfuel variable operating costs, startup/shut down costs, emission rates and allowance costs, electricity grid flow constraints, and reliability constraints.[2] The SEIS does not discuss how any of the proposed alternatives will impact any of these factors, so it is not clear how limiting future coal mining at the Spring Creek Mine would reduce *worldwide* coal demand—and worldwide emissions.

Coal production, like GHG emissions, is driven primarily by demand. SEIS at 3-115. In 2021, Spring Creek Mine produced 13.1 MMst, or about 4.5% of the U.S.'s surplus capacity. The SEIS assumes that there will be no substitution whatsoever of Spring Creek's coal, which is a clearly unrealistic assumption provided without evidence or discussion. The Ninth Circuit explicitly rejected an agency decision to omit foreign emissions from its GHG calculations, even when the exact emitter and quantities are unknown. 982 F.3d at 740. It is enough to know that there will be some increase in foreign emissions to warrant discussion and environmental analyses. *Scientists' Inst. For Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).

Based on information provided in the SEIS, it is reasonably foreseeable that Alternative D will result in increased emissions from other sources, and BLM must account for those other emissions. In fact, it is likely the total GHG emissions for Alternative D approximates GHG emissions of Alternatives A and B, because all of the downstream sources (which account for 97% of GHG emissions attributed to coal mining) will be able to source coal from elsewhere.

Under both the Interim Guidance and Ninth Circuit precedent, BLM must consider *all* reasonably foreseeable emissions caused by selecting an alternative. However, the SEIS misrepresents the total emissions of Alternatives C and D by failing to account for the foreseeable increase in emissions from other sources. If Spring Creek Mine is prohibited from further coal production, the downstream sources of GHG emissions will readily find additional coal from other mines. To the extent that coal comes from less efficient sources (as it likely will), the overall emissions may even increase, even if there is less than perfect substitution. In sum, the emissions from coal produced at sites other than Spring Creek Mine are foreseeable emissions that must be accounted for when evaluating Alternatives C and D. *See* 982 F.3d at 736.

---

[2] U.S. Energy Information Administration, Fuel Competition in Power Generation and Elasticities of Substitution, 1 (June, 2012) ("The elasticity of substitution concept measures how the use of these fuels varies as their relative prices change.") (https://www.eia.gov/analysis/studies/fuelelasticities/pdf/eia-fuelelasticities.pdf) (last accessed Jul. 25, 2023).

August 3, 2023
Page 7

**BLM improperly calculated the social cost of carbon for the all of the alternatives.**

Agencies should also provide context for GHG emissions and climate effects, which can include the social cost of GHG emissions. 88 FR 1196, 1202. However, calculating public health impacts from GHG emissions is inherently uncertain. *See Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) (upholding FERC finding that there was no scientifically-accepted methodology available to correlate specific amounts of GHG emissions to discrete changes in the human environment and FERC's rejection of the Social Cost of Carbon methodology for calculating climate change impacts). Nonetheless, the Interim Guidance provides guidance on how GHG emissions may be used to calculate the social cost of GHG emissions and provides appropriate context for the alternatives.

Under the Interim Guidance, agencies should quantify proposed actions' "total net GHG emissions or reductions (both by pollutant and by total CO2-equivalent emissions) relative to baseline." 88 FR 1196, 1201. If the social cost of GHG will be presented, it is calculated from the net GHG emissions. 88 FR 1196, 1202. Net GHG emissions account for the GHG impact of sources of GHG emissions that would be replaced by the proposal. 88 FR 1196, n53. For example, in an August 2022 Environmental Assessment associated with a geothermal lease, BLM determined that it was "reasonably foreseeable" that a geothermal facility would result in a reduction of GHG emissions by displacing fossil-fuel fired power plants. BLM, Environmental Assessment for the August 2022 Competitive Geothermal Lease Sale, 31 (Doc. # DOI-BLM-NV-B000-2022-0001-EA).

Here, the SEIS improperly calculates the social cost of GHG for Alternative D, because it does not use net GHG emissions. Instead, the SEIS calculates the social cost of GHG emissions using each alternative's total emissions (which, as discussed above, were also incorrectly calculated). Net emissions are equal to the difference between the total emissions of a proposed alternative and the total emissions it would displace. 88 FR 1196, n53. As discussed above, the SEIS wrongfully treats total emissions from Alternative D as zero. When calculating the social cost of carbon for Alternatives C and D, BLM must account for the increase in emissions attributed to the substitution of Spring Creek coal. As discussed above, those emissions at least approach the baseline, Alternative A.

Similarly, the SEIS fails to properly calculate the social cost of GHG for Alternatives A and B because it does not subtract the emissions displaced by the use of Spring Creek coal. Put another way, the SEIS assumes that there will be zero substitution. Once again, that is an erroneous and unsupported assumption. The SEIS properly recognizes that demand is driving production, but then it flips that relationship and assumes any reduction in production will create a 100% decrease in demand. In fact, those downstream sources are likely to emit as much GHG regardless of whether coal from Spring Creek Mine is available, and they must be accounted for to determine net GHG emissions and the social cost of GHG emissions.

If BLM selects Alternative D, no more coal would be produced at Spring Creek Mine after 2035, and the foreseeable consequence is that demand for coal would be met by other,

August 3, 2023
Page 8

potentially less efficient sources. Therefore, all of the alternatives should have approximately the same social cost of GHG.

**Conclusion**

The SEIS fails to adequately account for environmental justice concerns stemming from the significant harms the co-preferred alternatives would inflict on rural and indigenous communities. In fact, although the SEIS identifies the communities around Spring Creek Mine as environmental justice communities, it fails to make any meaningful consideration of how job losses from the mine's closures would impact community health and future. Finally, the SEIS fundamentally misstates both total and incremental GHG emissions, misrepresenting the tradeoffs between the proposed alternatives. BLM should adopt Alternative A, the No Action alternative, because the other alternatives will cause significant harm without providing meaningful environmental benefits or reducing GHG emissions.

<u>Exhibit B</u>

The following commentators also raised the issues discussed in this Protest, in comment letters due August 3, 2023.

- Landmark Resource Firm
- Montana Coal Council
- Montana Department of Natural Resources and Conservation
- National Mining Association
- Navajo Transitional Energy Company
- State of Montana, Office of the Governor
- Treasure State Resources Association

<u>Exhibit C</u>

Technical Deficiencies in Analysis of Spring Creek Mine

[Attached]

1. The Draft and Final SEIS incorrectly use the term "federal mine plan boundary" throughout the document. For example, when describing Alternative B in section 2.2.1 the EIS states, "The BLM derived the 2-mile buffer around existing approved <u>federal mine plan boundaries</u> based on the typical mining sequence in the MCFO." The correct term to use is the "mine permit boundary" which is approved by the MDEQ. The mine permit boundary is shown on several figures in the EIS including Figure 2-2b. The "federal mine plan boundary" is the boundary of the federal coal leases within the mine permit boundary.

2. The BLM did not provide justification why Alternative D was chosen, and the BLM does not have the authority to dictate when a private business will close. The May 2023 Miles City Field Office <u>Draft</u> Supplemental EIS and RMP Amendment states under section 2.3.2, "The BLM used the impact analysis, along with recommendations from cooperating agencies consideration of planning criteria; and anticipated resolution of resource conflicts to identify Alternatives B and D <u>as co-preferred alternatives</u> from the suite of alternatives analyzed." This indicates the BLM was considering Alternative B to lease federal coal within the mine permit boundary.

   The <u>Final</u> Supplemental EIS and RMP Amendment executive summary states, "the BLM selected Alternative D, No Leasing, as the Proposed RMP Amendment making no BLM-administered coal available for leasing within the planning area". Neither the executive summary nor the EIS provide the justification for BLM choosing only Alternative D. The SEIS also does not describe why other alternatives were not chosen.

   The only rational provided, is under section 2.2.3 which states, "The BLM has determined that <u>additional leasing of federal coal</u> is not necessary based on the current analysis in the Final SEIS. The analysis indicates that operating mines in the planning area have existing leases with <u>sufficient</u> coal reserves to maintain existing mine production levels until 2035 for Spring Creek Mine and 2060 for Rosebud Mine." The EIS states on p. 3-1, "Unless otherwise indicated, impact analyses assume a 17-year time horizon (2022–2038), also referred to as the analysis period. At the end of the planning period an RMP revision would reevaluate land use allocations." The statement made that the SCM has "sufficient" coal reserves is not correct based on other statements in the EIS.

   The EIS also states on page B-12, "Historically, the review and authorization process for federal coal leasing, federal mine plan approval, and MT DEQ mine permit approval has taken on average <u>10 years</u>. Therefore, coal mines have to plan ahead before there is an actual need for coal resources." Because the BLM chose Alternative D, according to the EIS, the SCM will run out of reserves four years before the RMP is reevaluated in 2039. Additionally, as stated in the EIS, typical time frame for coal to be leased and permitted requires 10 years. By choosing Alternative D, the BLM is choosing to shut down the SCM. The BLM does not have the authority to decide and/or dictate by virtue of holding the coal reserve, when a private business will close.

3.   The analysis for Alternative D in the Final SEIS does not disclose the environmental impacts accurately because it shows this alternative will generate zero emissions.  Table 3-28 for example, shows zero dollars for the social cost of carbon and Table 3-91 only discloses GHG emissions mining leased tons for Alternative D.  Additionally discussing Alternative D on p. 3-69 the EIS incorrectly states, "However, there would be <u>no emissions or air quality impacts</u> from coal mining, transportation, and downstream combustion due to pending federal lease applications."  The EIS acknowledges power plants would use alternative energy sources (which could be coal from a different mine) to provide the electricity.  The EIS states under section 3.6.2 p. 3-140 discussing Alternative D "Impacts would therefore vary by power plant area depending on the availability of <u>alternative coal sources to use in the absence of MCFO coal</u>."

Figure ES-7 below is from the most recent EPA U.S. Greenhouse Gas Emissions and Sinks Report 1990 - 2022 EPA.  Assuming 100% of the power needed under Alternative D were provided by renewable energy sources, emissions would be generated.  The figure shows renewables have doubled, natural gas has increased by about four times (and it generates less CO2 compared to coal), coal has decreased by less than half, and the Total $CO_2$ emissions have <u>only</u> decreased ~250 MMT $CO_2$ or about 13% since 1990.  All sources of energy generate GHG emissions.



4.   The figures in the draft SEIS and the final SEIS do not provide a scale which allows NTEC

to determine the business impacts from the RMP Amendment.  During the review of the draft SEIS, BLM provided shape files of the figures in the draft SEIS which allowed for a detailed review.  According to section 1.8 of the final SEIS, the only figure changed from the draft to the final SEIS is Figure A-25 which now more accurately shows the landowner response.  Because no other figures changed, shown below is "Draft SEIS Figure 2-2a Review".  This review shows several "unacceptable" conflict areas related to pending federal coal leases and areas currently mined.  The conflict areas are detailed below.

a. Figure A-9 shows Prairie falcon and merlin nesting sites within and adjacent to the SCM.  The information needs to be updated from the most recent annual Wildlife Monitoring Report for the SCM.  Nest site PF1b has been inactive since 2007 and PF2b has been inactive for the past five years.

b. Figure A-13 shows municipal watersheds within the SCM permit boundary.  This information is incorrect because there are no municipal watersheds within the SCM permit boundary.  The land within and surrounding the SCM is primarily privately owned.

c. Figure A-15 of the final SEIS shows the alluvial valley floor (AVF) areas which cross the current SCM mine permit boundary and the pending federal coal lease boundaries.  These areas are shown as "unacceptable without exception".  Extensive AVF studies have been completed in and surrounding the SCM and these ephemeral stream channels have been determined to not be classified as alluvial valley floors by the MDEQ. Because of this, the AVF conflicting areas of Figure A-15 in the final SEIS are not correct.

d. Figure A-18 of the final SEIS shows Lentic and lotic systems which are described as a 300 foot buffer to perennial streams.  The streams shown on this figure in proximity to the Spring Creek Mine are ephemeral and not perennial.  Because of this, the conflict areas shown in Figure A-18 are not correct.